**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**John SINCLAIR, Defendant–Appellant.**

**No. 94–3715.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 6, 1995.

Decided Jan. 10, 1996.

Barry Rand Elden, Chief of Appeals, Sheila Finnegan (argued), Office of United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

David C. Thomas (argued), Chicago–Kent College of Law, Chicago, IL, for Defendant–Appellant.

Before CUDAHY, FLAUM, and EASTERBROOK, Circuit Judges.

CUDAHY, Circuit Judge.

John Sinclair appeals his conviction and sentence for three counts of violating 18 U.S.C. § 215(a)(2), which prohibits the officers of financial institutions from soliciting or accepting anything of value in connection with the business of their institutions. A jury found Sinclair guilty on all three counts, and the district court sentenced him to serve twenty-one months in prison and to make restitution. Sinclair contends that the district court erred in its evidentiary rulings, its jury instructions and its determination of his sentence. Because our review of the record finds no such error, we affirm.

I.

Sinclair worked for Mellon Bank between May 1984 and February 1989, eventually rising to the position of assistant vice president. His responsibilities included developing and operating various programs that provided insurance to protect the bank's interest in its loans. One of those programs was the Collateral Protection Insurance Program (CPI program), which sought to guarantee that adequate auto insurance protected the cars in which Mellon had a collateral interest. The CPI program worked in two stages. In the first stage, an automated tracking system identified the borrowers who did not have enough car insurance and sent them a series of notices reminding them to purchase it. The second stage ensued if delinquent borrowers did not respond to the notices. At this point, Mellon Bank would "force place" a car insurance policy on the borrower by purchasing a policy from an insurance company, paying the premiums itself and adding the value of the premiums to the outstanding balance of the auto loan. The insurance company and the bank set the premiums for all borrowers at the highest rate, regardless of any borrower's actual driving record. The policies also included a number of potentially illegal endorsements that increased the premiums.

Mellon agreed to purchase the insurance policies from Transamerica and from Balboa Life and Casualty through an independent insurance broker. The broker received a commission of roughly 2% of all of the premiums that Mellon paid. In 1987, Sinclair dismissed the broker that Mellon had initially selected and went looking for a new one. To that end, he met with James Fortney, who had recently left a position at Transamerica. At Sinclair's trial, Fortney testified that Sinclair offered him the brokerage in return for his promise to give Sinclair an even split of the commissions. In his testimony, Sinclair maintained that he made Fortney a perfectly legitimate offer for the brokerage. Fortney served as broker from November 1987 until May 1988 when he returned to work for Transamerica.

During 1987 and 1988, Sinclair engaged in some business dealings that seemed to cor-

roborate Fortney's allegations. At about the same time that he was making his overtures to Fortney, Sinclair and his wife took the first steps towards starting their own company; and in January 1988, they formally established Independent Training, Inc. (ITI). The Sinclairs envisioned ITI as an enterprise that would sell computer programs to train people in insurance sales. In his trial testimony, Sinclair asserted that James Fortney was one of ITI's first clients, but Fortney denied that the Sinclairs ever trained him for anything.

With or without the Sinclairs' training, Fortney "sold" a substantial amount of insurance for the CPI program, and he received his first commission payment of $78,740.46 from Transamerica on May 13, 1988. On that same day, he wrote a check to ITI for $39,370.23. One week later, Sinclair opened an account for ITI at the Gary–Wheaton Bank and deposited Fortney's check. Transamerica made a second payment to Fortney of $18,522.24 in October 1988, and Fortney then made a second payment to ITI of $9,261.12. Except for one other check in the amount of $49.95, these checks from Fortney constituted all of the deposits to ITI's account and all of its income in 1988.

The Sinclairs withdrew most of the money in ITI's bank account for their own use, and they took several thousand dollars from the account to pay credit card bills. On ITI's 1988 tax return, Sinclair claimed a little over $11,000 in travel, training and entertainment expenses for ITI, providing receipts for them and noting that three credit cards had been used exclusively for ITI's corporate expenses. The particular expenses recorded on the receipts did not match a great number of the charges on the credit card statements paid with ITI funds; but they did match many of the business expenses that Sinclair had charged to his employer, Mellon Bank.

In late 1988, one of Mellon's in-house lawyers circulated a memorandum raising questions about the legality of the CPI program. Sinclair testified that he took these questions seriously and attempted to address any legal problems with the program. Sinclair insisted that his scrupulousness about the CPI program's legality led his superiors at Mellon to charge him with insubordination and to dismiss him in February 1989. Sinclair's subordinates testified that he defended the legality of the program and at all times advocated its continuation.

After his dismissal from the bank, Sinclair and his wife devoted themselves to ITI. Sinclair also devoted himself to exposing the legal problems with the CPI program. In early 1989, he leaked the internal legal memorandum about the CPI program to the Pittsburgh Press which used it as the basis for a front-page story. This publicity precipitated two class action lawsuits, one against Mellon Bank and one against Transamerica. In preparing its defense, Transamerica interviewed James Fortney, who revealed his kickback arrangement with Sinclair. The parties to the civil suits eventually settled, and Mellon and Transamerica agreed to pay more than $6,000,000 to Mellon's borrowers who had been affected by the CPI program.

Fortney's allegations did not disappear with the end of the civil suit. They led to these criminal charges against Sinclair in which the United States alleged that Sinclair violated 18 U.S.C. § 215(a)(2) on three different occasions: when he solicited the kickbacks from Fortney, and both times he accepted a portion of Fortney's commissions. A jury convicted Sinclair on all three counts.

## II.

■ Sinclair finds four errors in the district court's evidentiary rulings. He contends that the court excluded two pieces of evidence that it should have admitted: the testimony of an expert witness, and a hearsay statement. He also contends that it admitted two sets of documentary evidence that it should have excluded: one relating to his Mellon Bank expense accounts and ITI's financial records, and the other pertaining to his compliance with Mellon Bank's code of conduct. In making these contentions, Sinclair faces a formidable abuse of discretion standard of review. *United States v. Gill,* 58 F.3d 334, 337 (7th Cir.1995). There is an abuse of discretion only when no reasonable person could agree with the court's ruling.

*United States v. Valona,* 834 F.2d 1334, 1340 (7th Cir.1987).

### A.

Sinclair first argues that the district court erred in excluding the testimony of Alexander Wayne, an expert witness who would have testified that both the CPI program and the contractual relationship between Fortney and Transamerica were illegal. To a considerable extent, the government's case turned on the credibility of Fortney and Mellon Bank employees. Sinclair wanted Wayne to tell the jury that these witnesses had engaged in illegal conduct of their own, hoping that this showing would raise an inference that some of the crucial witnesses against him sought to shift blame away from themselves by falsely implicating him in a crime.

The district court ruled that Sinclair could establish the bias of government witnesses without Wayne's testimony. The proposed testimony would involve legal issues raised in the civil suits against Mellon Bank and Transamerica. The district court thought that this evidence could confuse or distract the jury. Moreover, the court thought that Sinclair could raise an inference of bias in other ways. Mellon Bank's employees were arguably biased because of the $6,000,000 judgment against the bank that Sinclair had helped to engineer; Fortney could be impeached by the grant of immunity that he received in return for his testimony against Sinclair. The court ruled under Federal Rule of Evidence 403 that the prejudicial effect of Wayne's testimony would outweigh its probative value.

 Rulings on the admissibility of expert testimony are entitled to the same deference as evidentiary rulings generally. *See Deimer v. Cincinnati Sub-Zero Prods., Inc.,* 58 F.3d 341, 344 (7th Cir.1995). The potential for jury confusion may be substantial when the evidence refers to legal issues at the heart of other litigation; such evidence can create a distracting trial within a trial. In such cases, the trial court may exclude the evidence if the purpose for which it is offered can be accomplished through other means. *See International Surplus Lines, Inc. v. Fireman's Fund Ins. Co.,* 998 F.2d 504, 508 (7th Cir.1993). Here, the district court exercised precisely this kind of discretion, concluding that Sinclair could effectively impeach the witnesses against him without offering potentially confusing testimony. Our cases tell us that we should defer to such discretionary judgment. *Id.*

Sinclair urges us to do otherwise. He contends that the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), has changed the way that judges should balance the probative value and prejudicial effect of expert testimony. According to Sinclair's reading of *Daubert,* the Supreme Court created a special two-part test for the admissibility of expert testimony. As Sinclair tells it, this test provides that expert testimony is always admissible if: (1) it can be appropriately validated and (2) it will assist the trier of fact in understanding an issue. This test is, of course, simply a restatement of Federal Rule of Evidence 702, but in his application of it, Sinclair seems to suggest that the second part of this special test relieves a trial court from having to apply Rule 403. In Sinclair's proposed analysis, expert testimony is necessarily more probative than prejudicial if a jury could properly evaluate or understand its impact on a relevant issue. He thinks that Wayne's prospective testimony passed this test and that the district court should have admitted it.

Because we cannot read *Daubert* as Sinclair does, we must reject his argument. *Daubert* does not create a special analysis for answering questions about the admissibility of all expert testimony. Instead, it provides a method for evaluating the reliability of witnesses who claim scientific expertise. *See Daubert,* —— U.S. at —— – ——, 113 S.Ct. at 2792–99. *Daubert,* therefore, has no direct relevance to questions about the admissibility of testimony by a witness who claims legal expertise.[1] Moreover, it does not relieve

---

1. By arguing about the admissibility of Wayne's testimony, Sinclair implicitly raises a legal question that neither he, nor the government, nor the district court addressed. Because an answer to

courts of the obligation to evaluate expert testimony under Rule 403. Wayne's testimony was subject to the ordinary application of Rule 403, and the district court did not abuse its discretion by applying the rule.

Sinclair also characterizes the district court's exclusion of Wayne's testimony as depending upon a conclusion that the testimony was cumulative with other evidence about the bias of witnesses against Sinclair. He claims that Wayne's testimony would have provided the first evidence about the illegality of actions by Mellon and Fortney. Therefore he argues that the exclusion of Wayne's testimony was based upon an erroneous conclusion. We reject this argument because we think that Sinclair has misunderstood the district court's reason for the exclusion. When a district court excludes one piece of evidence because other evidence will adequately replace it, it is not necessarily deciding that the excluded evidence is cumulative. It could be ruling that the evidence's probative value is less than its harmful effects. Indeed, when the district court excluded Wayne's testimony, it did not rule that the testimony would be cumulative; it ruled that the testimony was more trouble than it was worth.

### B.

Sinclair also complains that the district court improperly excluded a hearsay statement that he offered to impeach Fortney. Fortney testified that he had revealed his kickback arrangement with Sinclair only when two officers from Transamerica directly asked him whether he had ever given any portion of his commissions to Sinclair. One of those officers, Bolin Higgs, corroborated this testimony in a statement to the Federal Bureau of Investigation; but, in a later statement to a prosecutor, he contradicted it, asserting that Fortney revealed the kickback scheme on his own initiative. Shortly before trial, the prosecutor informed Sinclair's counsel about this contradiction and provided him with Higgs' telephone number in California. By this time, Higgs was the only person who could testify about the circumstances of Fortney's revelation; the other Transamerica officer, Jack Trapp, had died. At trial, the defense attempted to introduce Higgs' statements to the Assistant United States Attorney under the residual exception to the general rule excluding hearsay statements, Federal Rule of Evidence 803(24). The district court ruled that the exception did not apply and excluded the statement.

■ The proper standard of review for an application of Rule 803(24) is abuse of discretion. *Doe v. United States*, 976 F.2d 1071, 1076 (7th Cir.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 58, 126 L.Ed.2d 28 (1993). Moreover, we have emphasized that trial courts have a " 'considerable measure' " of discretion in deciding when a hearsay statement fits the residual exception. *Id.* at 1076 (quoting *Moffett v. McCauley*, 724 F.2d 581, 583 (7th Cir.1984)). We will find an abuse in circumstances only where the trial court committed a clear and prejudicial error of judgment in determining whether a statement met the conditions for the application of

this question will not be dispositive here, we will not provide one. Nevertheless, the question itself deserves some notice.

The question is this: when can expert witnesses offer legal opinions? In addressing this question, federal courts have not provided uniform answers. *See* Note, *Expert Legal Testimony*, 97 Harv.L.Rev. 797 (1984) (discussing the legal controversy over the admissibility of legal opinion testimony). Our own cases have determined that Federal Rules of Evidence 702 and 704 prohibit experts from offering opinions about legal issues that will determine the outcome of a case. That is, they cannot testify about legal issues on which the judge will instruct the jury. *See, e.g., Bammerlin v. Navistar Internat'l Transp. Corp.*, 30 F.3d 898, 900 (7th Cir.1994); *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 366 (7th Cir.1990). Our cases have also indicated that there are some circumstances in which experts can offer legal opinions, but we have not exhaustively identified them. *See, e.g., Allison v. Ticor Title Ins. Co.*, 979 F.2d 1187, 1196 (7th Cir.1992); *United States v. Baskes*, 649 F.2d 471, 478–79 (7th Cir.1980), *cert. denied*, 450 U.S. 1000, 101 S.Ct. 1706, 68 L.Ed.2d 201 (1981). Not every court has followed this approach, however; and some of their opinions do not clearly determine when experts may and may not testify about legal issues. *Compare Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505 (2d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977) *with United States v. Bilzerian*, 926 F.2d 1285, 1294–95 (2d Cir.), *cert. denied*, 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991).

the residual exception. *Huff v. White Motor Corp.*, 609 F.2d 286, 291 (7th Cir.1979). Here, when Higgs presumably could have been subpoenaed to testify, there is no good reason to admit his hearsay statement.

In this connection, the text of Rule 803(24) identifies the conditions for the application of the residual exception. The rule provides that a court may admit a hearsay statement that is not covered by any of the other exceptions if: (1) the statement has circumstantial guarantees of trustworthiness that are equivalent to those that justify the other 23 exceptions to the hearsay rule; (2) the statement is offered as evidence of a material fact; (3) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; (4) admission of the statement will advance the interests of justice and the purposes of the rules of evidence; (5) the proponent of the statement gives sufficient notice to her opponent of her intention to introduce it. Fed.R.Evid. 803(24); *see also Huff*, 609 F.2d at 291–94. Congressional commentary on the exception indicates that courts should define these conditions narrowly so that they do not use the exception as a way of dramatically revising the hearsay rule. *See* Notes of the Committee on the Judiciary, S.Rep. No. 93–1277, Note to Paragraph (24), Fed.R.Evid. 803, 28 U.S.C.A. (West 1984). We have followed this guidance. *See Huff*, 609 F.2d at 291.

Sinclair argues that the district court erred in excluding Higgs' statement to the prosecutor because it satisfied all five of the conditions for admission under the residual exception. But we believe that the statement did not satisfy the first and third conditions.

As to the first, the statement does not have sufficient circumstantial guarantees of trustworthiness. In arguing that it does, Sinclair points to several relevant circumstances. For one thing, he argues that Higgs had purer motives when making the second statement because Transamerica no longer employed him. In addition, Higgs' second statement exposed him to the risk of prosecution because it suggested that he lied to federal investigators when making his first statement.

As Sinclair contends, Higgs' motive and the nature of his penal interests affect trustworthiness, but these indications must be weighed against the great lapse of time between the statement and the event that it describes. Most of the recognized exceptions to the hearsay rule permit the admission of hearsay statements that convey personal knowledge at the time of their utterance. *See* Fed.R.Evid. 803. The immediacy of this knowledge is one of the key circumstances indicating trustworthiness. These exceptions to the hearsay rule do not include statements that express memory of distant events. Because the proffered statement by Higgs was a recollection of a distant event, it does not have the sort of indicia of reliability that characterize the specific exceptions listed in the rule.

Higgs' statement fails to satisfy the third condition for recourse to the residual exception because it is significantly less probative than other evidence that Sinclair could have reasonably obtained, such as Higgs' live testimony. The inconsistency of the statement with Higgs' earlier declarations to the F.B.I. diminishes its probative value. The existence of this inconsistency suggests that Higgs may have an uncertain memory about his phone call with Fortney. If Higgs were produced as a live witness, both Sinclair and the government could explore his shaky memory. Otherwise, the parties are left with two conflicting and inconclusive hearsay statements.

Sinclair argues that Higgs' in-court testimony was not reasonably available. In his view, Higgs' second hearsay statement is reliable enough to make it unreasonable for him to pay Higgs' airfare from California to Chicago.[2] Hence, he contends that Higgs' live testimony was not worth the cost, and he

2. We do not understand Sinclair to be arguing that he did not have the money required to bring Higgs to Chicago as a witness. If he had needed Higgs' live testimony in order to present an adequate defense but was unable to afford the expense of obtaining it, the United States would have paid for Higgs' travel to Chicago under 18 U.S.C. § 3006A. *See United States v. Morrison*, 946 F.2d 484, 490 (7th Cir.1991).

suggests that hearsay statements are admissible when they are probative and when they provide for a cost-efficient defense. In this connection, he cites *F.T.C. v. Amy Travel Serv., Inc.*, 875 F.2d 564, 576 (7th Cir.), *cert. denied,* 493 U.S. 954, 110 S.Ct. 366, 107 L.Ed.2d 352 (1989). In that case, we upheld a decision to admit the affidavits of numerous witnesses because the witnesses were scattered all over the country, making their in-court testimony difficult and expensive to obtain. But *Amy Travel* does not establish a general rule applicable to all situations involving distant witnesses. In fact, the proponents of the hearsay statements in *Amy Travel* faced greater difficulty and expense in obtaining in-court testimony than did Sinclair. Moreover, difficulty and expense were not the only factors relevant to the decision in that case. The district court there also considered the fact that the affiants' hearsay statements had a high index of reliability—they were made under penalty of perjury. *Id.* Thus, their probative value may have approached that of live testimony. We cannot say the same of Higgs' statement to the Assistant United States Attorney. Hence, it was not error to exclude the statement.

## C.

■ The government wanted to prove that Sinclair and Fortney had concocted a scheme to disguise the kickbacks from Fortney as payments to ITI; so it introduced evidence suggesting that Sinclair had fiddled with ITI's tax returns as a means of disguising the illicit nature of the transactions in which he and Fortney had engaged. That evidence included copies of ITI's tax returns and of Sinclair's expense account reports to Mellon Bank. On the tax returns, Sinclair had deducted the expenses associated with certain business trips from ITI's income, and he provided receipts from those trips. On the expense account reports, Sinclair told Mellon Bank that he had transacted bank business on those same trips; he thus asked the bank to reimburse him for the expenses that he was also attributing to ITI. The copies of the expense account reports were not, however, perfectly complete; they did not reproduce the reverse side of the originals. Before trial, Sinclair made a motion in limine to

exclude this evidence, but the district court admitted it, ruling that it had a legitimate purpose and that the omissions from the copies of the expense account reports did not affect the substance of the documents.

As he did at trial, Sinclair argues that the expense account reports should not be admitted because they do not meet the requirements of Federal Rule of Evidence 1003, which controls the admissibility of duplicates. Rule 1003 provides that district courts may admit a duplicate to the same extent that they admit an original unless the duplicate comes from an original of questionable authenticity or unless the admission of the duplicate in lieu of the original would be unfair. Sinclair contends that the admission of the reports was unfair here for two reasons. First, he maintains that the use of the duplicate reports raised an unnecessary danger of fraud and error because they were specifically prepared for his trial; he cites *CTS Corp. v. Piher Internat'l Corp.*, 527 F.2d 95, 105 (7th Cir.1975), *cert. denied,* 424 U.S. 978, 96 S.Ct. 1485, 47 L.Ed.2d 748 (1976) in support. Second, he insists that the omitted portions of the expense account reports would have been useful in his defense; he cites *Amoco Prod. Co. v. United States*, 619 F.2d 1383, 1391 (10th Cir.1980) for the proposition that incomplete duplicates should not be admitted when the omissions deprive the defense of useful information.

Although the cases support Sinclair's argument, the record does not. In ruling on Sinclair's motion in limine, the district court specifically found that the copies of the expense account reports were not prepared with litigation in mind; they came from the microfiche records that Mellon Bank collects in the ordinary course of its business. And the district court undertook a detailed examination of the omitted portions of the originals before finding that the omissions would not have affected the usefulness of the duplicates. The government submitted copies of eight expense reports, and the copies reproduced only the front side of each original. The missing reverse side contained a place to itemize the expenses entered on Line 16 of the front. Only three of the eight copies included an entry on Line 16, and the entries

were for $25, $36.75, and $112.57 respectively. Given the nature and magnitude of the expenses claimed in the reports as a whole, the district court concluded that a detailed description of these individual entries would not have changed their purported effect, nor would the details have been useful to the defense. We will not upset this careful determination.

### D.

■ Sinclair also complains that the district court erred in allowing the government to introduce evidence about his compliance with Mellon Bank's code of conduct. According to the code, all of Mellon's employees had to get the bank's permission to serve as the officers or directors of other corporations. Although Sinclair had signed certificates affirming his compliance with the code, the government wanted to show that Sinclair had not, in fact, obtained permission to serve as an officer and director of ITI. It thought that this showing would prove that Sinclair had the *mens rea* for the crimes with which he was charged. The statute under which the government charged Sinclair, 18 U.S.C. § 215(a)(2), required that Sinclair have the corrupt intent to solicit or take money in relation to bank business. The government thought that it could show such an intent by showing that the bank's code of conduct notified him about the difference between legal and illegal behavior. The district court agreed and admitted the evidence.

Sinclair repeats the argument that he offered to the district court: that the discussion of his compliance—or non-compliance—with the code of conduct is irrelevant because Sinclair's own defense never disputed the issue of *mens rea*. At trial, Sinclair did not try to prove that he lacked a corrupt intention when he took money from Fortney in relation to bank business; he tried to prove that the money he received from Fortney related only to ITI's legitimate business. Sinclair further argues that, because this evidence is irrelevant, it is also prejudicial under Federal Rule of Evidence 404 because it refers to his commission of other bad acts, namely the violations of Mellon's code.

Although this evidence did have a slight tendency to show Sinclair's propensity to commit wrongs, its predominant effect pertained to the legitimate purpose of proving his intent. To convict Sinclair under 18 U.S.C. § 215(a)(2), the government had to prove that Fortney paid money to Sinclair, that the payment arose from bank business and that Sinclair had a corrupt intent with respect to the payment. The parties never disputed the payment, and Sinclair's defense did focus on the nature of the payment; but these facts did not relieve the government of the obligation to submit some evidence to prove *mens rea*. Because evidence about Sinclair's compliance with Mellon's code of conduct could tend to prove the purity or corrupt nature of his intentions, the district court did not err in deciding that the probative value of this evidence outweighed its prejudicial effect. *See United States v. Sullivan*, 911 F.2d 2, 6 (7th Cir.1990).

### III.

■ Sinclair also faults certain instructions purporting to explain the statute under which he was charged, and he complains that the district court improperly rejected his proposed instruction relating to his theory of the case. A defendant is entitled to an instruction on his theory of the case if: he proposes a correct statement of the law; his theory is supported by evidence; his theory of defense is not otherwise provided in the instructions; and the failure to include an instruction on his theory of the case would deny him a fair trial. *United States v. Boykins*, 9 F.3d 1278, 1285 (7th Cir.1993). Similarly, a district court may refuse a proposed jury instruction if the other instructions convey the same message as the proposed instruction.

■ Sinclair proposed the following instruction:

A payment from James Fortney to John Sinclair for work that John Sinclair performed in preparing a program to train people to sell indirect automobile insurance is a bona fide payment in the ordinary course of business as that term is used in subsection (c) of 18 U.S.C. § 215.

Instead of using this instruction, the district court recited the relevant portions of 18 U.S.C. § 215, including the provision that bona fide compensation paid for services performed in the ordinary course of business is not a bribe. The court also explicated the text of the statute, telling the jury what facts they had to find to convict Sinclair, and pointing out that they could not convict him if "the thing of value [that he received] was ... bona fide salary, wages, fees, or other compensation paid or expenses paid or reimbursed in the ordinary course of business." Finally, the court reminded the jury that Sinclair had taken the position that the money that Fortney paid him was bona fide compensation for work done by ITI.

Sinclair argues that the instructions given by the district court were too confusing and that the jury could not have understood his affirmative defense without the instruction that he offered. We are not persuaded. The district court adequately covered the matters included in Sinclair's theory of the case, and the jury had all of the necessary information.

## IV.

Sinclair's final arguments pertain to his sentencing. He contends that the district court should have sustained his objections to two items in his presentence report that supported enhancements of his sentence. And he contends that the district court should have departed downward because the conduct for which he was convicted was an instance of "aberrant behavior."

### A.

■ The federal Sentencing Guidelines provide that a sentencing court may increase the offense level by two levels if the offender obstructed justice during the investigation or prosecution of his offense. United States Sentencing Commission, Guidelines Manual § 3C1.1 (1994). Perjury can, of course, constitute obstruction of justice for the purposes of the Guidelines. *Id.* at § 3C1.1, comment., n. 3(b). To establish an obstruction of justice, the sentencing court must make an independent factual finding that the defendant engaged in a willful attempt to provide false testimony. *United States v. Dunnigan,* 507

U.S. 87, 93–96, 113 S.Ct. 1111, 1116–17, 122 L.Ed.2d 445 (1993). This may be reversed only if clearly erroneous. *United States v. Winston,* 34 F.3d 574, 581 (7th Cir.1994).

■ At sentencing, referring to Sinclair's trial testimony denying that Fortney's payments to him were bribes, the district court said: "[h]aving heard all of the evidence presented at trial, the court finds that Sinclair's testimony on this material issue was untruthful and was made not as the result of confusion, mistake or faulty memory, but rather with the specific intent to substantially affect the outcome of this case." This is clearly sufficient. Oddly, Sinclair does not argue that *this* finding was erroneous. Rather, he argues that the presentence report is not sufficient to prove that he lied or obstructed justice. He might be right. But the district court's finding did not depend on the presentence report alone; it depended on the court's evaluation of Sinclair's testimony in light of all the evidence in the case. Because this finding and its foundation satisfy *Dunnigan,* the enhancement must stand.

### B.

■ The Sentencing Guidelines also provide that a court may increase a defendant's offense level if it finds that his crime involved the abuse of a position of trust. Guidelines Manual, § 3B1.3. A court may not, however, employ this enhancement if the base offense level already accounts for an abuse of trust. *Id.* Because a decision on the application of this enhancement involves a question of law, we review *de novo. United States v. Hathcoat,* 30 F.3d 913, 919 (7th Cir.1994).

Sinclair argues that the district court erred in employing the enhancement here because 18 U.S.C. § 215(a)(2) includes an abuse of trust as an element of the offense. This argument reminds us of the need for care in the application of certain enhancements to the base offense levels. Sinclair urges us to look behind the offense level itself and to analyze the elements of the underlying offense when determining the propriety of an enhancement.

This may be a proper approach to analyzing enhancements, but such an analysis would not change Sinclair's Guidelines score. When the Guidelines establish an offense level for a statute that defines a single crime, a sentencing court may presume that the specified offense level accounts for every element of the crime. When an "aggravating factor" such as abuse of trust is a necessary element of the crime, a court may not employ an enhancement for the same factor. To do so would be double-counting. *See* Guidelines Manual, § 3B1.3. The statute under which Sinclair was convicted, 18 U.S.C. § 215, defines two crimes, each of which has different elements. Section 215(a)(1) provides for the punishment of persons who *offer* bribes to the officers of financial institutions; section 215(a)(2) provides for the punishment of such officers who *solicit* or *accept* bribes. An abuse of trust is necessarily an element of the latter crime because the officers of financial institutions are in a position of trust with respect to the entities for which they work. But it is not an element of the crime defined in § 215(a)(1) because the offerors of bribes to bank officers need not abuse a position of trust. Under § 2B4.1 of the Guidelines Manual, both the offering and the solicitation or acceptance of bribes in connection with the transactions of financial institutions have the same offense level despite their different elements. Consequently, the offense level for the solicitation or acceptance of bribes does not account for an abuse of trust, and an enhancement for abuse of trust, when it is found, is proper. Otherwise, the offeror of a bribe who did not breach a trust and a bank officer who did would receive the same sentence. Under the Guidelines, this would be incorrect. The district court gave the sentence that the Guidelines intended for Sinclair's crime.

### C.

At the sentencing hearing, Sinclair moved for a downward departure, arguing that his criminal conduct in this case was an instance of aberrant behavior. The district court denied this motion.

Sinclair on appeal repeats the arguments that he made at the sentencing hearing, inviting us to revisit the district court's judgment about both the law and the facts. He contends that we should change our approach to downward departures to conform to that of the Ninth Circuit. *Compare United States v. Gulley,* 992 F.2d 108, 111 (7th Cir. 1993) *with United States v. Takai,* 941 F.2d 738, 743 (9th Cir.1991).

We are without jurisdiction to consider a new approach and apply it here. A sentencing court has discretion to depart from the sentence indicated by the Sentencing Guidelines. *See* 18 U.S.C. § 3553. That discretion is unreviewable so long as the sentence is within the range of sentences specified by the Guidelines. *See United States v. Winston,* 34 F.3d 574, 581 (7th Cir.1994). Consequently, we cannot review a sentencing court's refusal to exercise the discretion to depart from the sentence that the Guidelines prescribe. *Id.* We can, of course, review a refusal to depart when based upon a legal conclusion that § 3553 does not provide authority for such a departure. *United States v. Poff,* 926 F.2d 588, 590–91 (7th Cir.), *cert. denied,* 502 U.S. 827, 112 S.Ct. 96, 116 L.Ed.2d 67 (1991). Sinclair asks us to review the exercise of discretion, and for that we are without jurisdiction. For these reasons, the judgment of the district court is

AFFIRMED.