**Mike AKRABAWI, Plaintiff–Appellant, Cross–Appellee,**

v.

**CARNES COMPANY, Defendant–Appellee, Cross–Appellant.**

Nos. 97–3266, 97–3399.

United States Court of Appeals, Seventh Circuit.

Argued April 1, 1998.

Decided Aug. 10, 1998.

---

Robert J. Gingras, Paul A. Kinne (argued), Madison, WI, for Plaintiff–Appellant.

Marshall Berkoff, Joshua L. Gimbel, Scott C. Beightol (argued), Michael, Best & Friedrich, Milwaukee, WI, for Defendant–Appellee in No. 97-3266.

Joshua L. Gimbel, Scott C. Beightol (argued), Michael, Best & Friedrich, Milwaukee, WI, for Defendant–Appellant in No. 97-3399.

Before CUDAHY, FLAUM, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

In this case a discrimination plaintiff, Mike Akrabawi, appeals from the denial of motions for a new trial and for attorneys fees following a jury verdict in favor of his employer, the Carnes Company, in a Title VII national origin case. Meanwhile, the Carnes Company appeals from the denial of a motion for attorneys fees following the jury verdict on Akrabawi's claims. Carnes also cross-appeals from the denial of a motion for a new trial following a jury verdict in favor of Akrabawi on Carnes' tort claim for misrepresentation. We affirm across the board.

In April of 1991 the Carnes Company hired Akrabawi, who was born in Amman, Jordan, as an assembler at its factory in Verona, Wisconsin. Carnes makes sheet

metal products for heating, ventilating, and air conditioning. In January of 1992, Akrabawi and 13 other factory workers were laid off. The company recalled Akrabawi 5 days later as a materials control clerk. In 1994, however, events took a turn for the worse. In May Akrabawi applied for a "facilitator" position (basically a factory supervisor, or team leader) at Carnes. After interviews, Akrabawi ranked sixth out of a field of 12 candidates for the post. The company hired the three highest-rated contenders. Akrabawi lost out, but he persisted. In June he applied for a "human resources assistant" position. The company treated this job differently from Akrabawi's clerk position. The human resources job required a bachelor's or associate's degree. On his application for the human resources position (and on his original application for employment at Carnes) Akrabawi stated that he attended Cairo University in Egypt, graduating in 1968 with a bachelor's degree in Business Administration. Crucially, Akrabawi could never satisfy Carnes that he possessed this degree. During the process, however, a Carnes manager made discriminatory statements. Akrabawi didn't get the job—but Carnes got this lawsuit.

Carnes apparently required two managers to interview all job candidates and required candidates to verify their degrees. Akrabawi suggests in his brief that Carnes applied these requirements inconsistently, but he put forth little evidence on this point. In any event, Steve Bielefeldt—the manager of human resources-interviewed Akrabawi in late June of 1994. Akrabawi told Bielefeldt of his degree from Cairo University and of additional education in Chicago—at the University of Chicago, according to Bielefeldt; at the Aerospace Institute according to Akrabawi. Bielefeldt liked Akrabawi so much that he told Akrabawi that he would recommend him for the job. Bielefeldt sent Akrabawi to interview with Greg Cichon, Carnes' general manager.

Cichon interviewed Akrabawi on July 6, 1994. Akrabawi claims that this interview itself was suspicious—he contends that Bielefeldt had offered him the job already. Anyhow, at the interview, Cichon requested verification of the Cairo University degree. Cichon also inquired about the University of Chicago. Akrabawi explained that he attended the Aerospace Institute in Chicago—not the University of Chicago—and that he received a 2–year degree. He said he would bring verification of the two degrees the next day. Akrabawi claims that he told Cichon that he actually attended Ain Shams University in Cairo—but just wrote down Cairo University on the applications because it was easier. Cichon, however, testified that he learned nothing about Ain Shams University until later. Importantly, according to Akrabawi, Cichon explained the need for verification by stating: "If you were one of us, it would be easy to check you out."

On July 7 Akrabawi brought Cichon a variety of documents (letters from previous employers and his high school transcripts), but no verification on his college degrees. Cichon reiterated the need for official verification. Akrabawi told Cichon that he possessed no official documents from Cairo University. According to Cichon, Akrabawi told Cichon to write to Cairo University or the Egyptian Embassy. However, Akrabawi did show Cichon a letter from the Aerospace Institute stating that it conferred a B.S. degree on Akrabawi in 1973. He would not let Cichon copy the letter. At some point in this meeting Cichon told Akrabawi: "I do not trust anything from overseas."

To resolve the problem, Cichon contacted the successor to the Aerospace Institute, the Industrial Engineering College of Chicago. The institution agreed to fax Akrabawi's file. When Cichon received these records he noticed several discrepancies. First, Akrabawi did not receive a degree from the Aerospace Institute—he attended the school for only one trimester. Second, the materials showed that Akrabawi received a bachelor's degree from Ain Shams University in Cairo (after spending his first year at Arab University in Beirut). The documents included what appears to be a translated college transcript. Akrabawi now explains that this transcript came from Ain Shams University. While arabic seals and notations appear at the bottom of the transcript, the document does not include the name of any institution in En-

glish. Nevertheless, Akrabawi contends that the transcript should have satisfied Carnes' verification requirements. Carnes explains that the transcript does not constitute adequate verification because of the Cairo University discrepancy and because of the lack of sufficient identification on the transcript.

Cichon discussed these problems with Bielefeldt and Akrabawi. Cichon explained that Akrabawi could not fill the human resources assistant job until he resolved these discrepancies and provided verification of his college degree. Cichon wrote to both Cairo University and Ain Shams University to request verification of Akrabawi's degree. Meanwhile, Bielefeldt spoke with Akrabawi and emphasized the need for verification. Bielefeldt continued to hold the position open for Akrabawi. On August 9 Bielefeldt met with Akrabawi and asked him to either fill out a new application correctly listing his education or to sign a form attesting to the accuracy of the original application. Akrabawi refused. On August 15 Carnes hired Brett Weum, who was born in the U.S., after both Cichon and Bielefeldt interviewed Weum and after they verified his degree. In September Akrabawi and Cichon met again. At this meeting, Cichon claims Akrabawi first explained that he attended Ain Shams University but listed Cairo University for the sake of simplicity.

On October 17, 1994, Akrabawi filed a charge of discrimination with the Wisconsin Equal Rights Division. Bielefeldt told the investigating Equal Rights officer that Akrabawi did not get a fair shot at filling the human resources position. At some point Akrabawi contacted the EEOC and, after getting a right to sue letter, this lawsuit was filed. Akrabawi eventually made three national origin discrimination claims based on Carnes' failure to promote him to three positions: a human resources job in 1992, the facilitator job in 1994, and the human resources job in 1994. He included a damages claim under 42 U.S.C. § 1981 and he sued Cichon individually. Later he amended his complaint to include a count for retaliation following his Wisconsin discrimination complaint. Carnes' hard-nosed answer included state tort counterclaims for intentional mis-

representation, negligent misrepresentation, and abuse of process.

Carnes also responded by aggressively pursuing the "truth." As the company explains in its brief, it had Akrabawi complete a power of attorney authorizing an Egyptian attorney, Hatem Soliman, to contact Ain Shams University and find out what it knew about Akrabawi. Soliman found that the university had no records of Akrabawi graduating in 1968. Apparently Carnes also obtained Akrabawi's INS records on which he claimed that he worked for a Jordanian airline from 1964 until 1969 and attended college from 1969 to 1976. Carnes informs us that it has a "zero tolerance" policy toward dishonesty and that it has, in the past, fired employees for fraud, falsifying records, and theft.

The case went to trial in April of 1997. By that point, Carnes had dropped its abuse of process claim and the court had dismissed Akrabawi's § 1981 claim, his 1992 human resources claim, and his retaliation claim. Thus, the jury heard evidence on Akrabawi's two Title VII national origin discrimination claims and on Carnes' misrepresentation claims. The jury found for Carnes on the discrimination claim based on Akrabawi's denial of the 1994 facilitator job. Interestingly, the jury concluded that Carnes did discriminate against Akrabawi during the hiring process for the 1994 human resources job. But, crucially, it found that Carnes would not have hired Akrabawi for the human resources job even if it didn't discriminate. Thus, Akrabawi ended up losing on both his claims. Carnes fared no better. The jury found that Akrabawi did not misrepresent information to the company. Both parties filed post-trial motions, which the district court denied. Today we resolve the joint appeals filed by Akrabawi and Carnes.

The obvious acrimony between the parties makes this an unpleasant case. Despite the rancor, the judge and jury resolved this case properly. Unfortunately, the antipathy seems to have continued on appeal. Here, it compromised the litigants' ability to write dependable briefs—each side has omitted crucial unfavorable facts. We caution all litigants that playing hide the ball gains them

nothing and, more importantly, it runs the risk of raising the ire of judges. Rather than dwelling on this unpleasant facet of this case, however, we move without further comment to the legal issues.

■ First, Akrabawi requests that we review the denial of his new trial request because the court improperly allowed Carnes to amend its answer on the final day of the trial. The court allowed Carnes to add an affirmative defense: Even if Carnes discriminated against Akrabawi based on his national origin, it denied him the human resources job for other valid reasons. This is the so-called "but for" defense. The court allowed this amendment on the second (and last) day of the trial when only the cross and redirect examination of one witness remained to be completed.

The legal basis for the "but for" defense comes from 42 U.S.C. § 2000e–5(g)(2)(B):

On a claim in which an individual proves a violation under section 703(m) [42 USCS § 2000e2(m) ] and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court—

(i) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 703(m) [42 USCS § 2000e2(m) ]; and

(ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A).

Akrabawi contends that the tardy amendment caused unfair surprise and undue prejudice. He cites *In re Stavriotis*, 977 F.2d 1202, 1204 (7th Cir.1992), for the proposition that a court should not grant leave to amend if the amending party showed no excuse for the failure to raise the claim earlier or if the amendment would cause undue prejudice. He argues that Carnes presented no evidence to show what the company would have done absent discrimination. He also claims that a court should allow a last-minute amendment based on late-discovered facts,

not based on a late-discovered legal theory. *See Gardner v. Southern Ry. Sys.*, 675 F.2d 949, 953 (7th Cir.1982). Akrabawi argues that the court should not have allowed the amendment after already permitting Carnes to file two amended answers. Finally, Akrabawi says that the court should have directed a verdict on the issue because Carnes introduced no evidence of what would have happened to Akrabawi independent of Cichon's discrimination.

■ We review the court's grant of leave to amend a pleading only for an abuse of discretion. *See Eades v. Thompson*, 823 F.2d 1055, 1062 (7th Cir.1987). Here, the district court explained that it allowed the amendment because the defense conformed to the evidence presented and because Akrabawi knew of the issue and addressed it both before and during trial. Carnes adds that the defense appeared in the jury questions it submitted before trial.

We think the court correctly determined that the amendment caused no prejudice and that Akrabawi did not deserve a directed verdict. The amendment is a logical outgrowth of the evidence. It seems inconceivable that Akrabawi did not anticipate Carnes' argument on this point. The company's obvious defense to Akrabawi's claim of discrimination is that it didn't hire him because he lied on his application and because he failed to verify the credentials required for the job. As the court explained, the defense evidence as known to Akrabawi before trial supported this theory. Therefore, Akrabawi suffered no prejudice—he had sufficient notice of Carnes' approach to the discrimination claim. Furthermore, because the evidence plausibly supported Carnes' position, the court correctly denied Akrabawi's motion for a directed verdict.

■ Next, Akrabawi contends that the court erred by asking a separate jury question based on the "but for" defense rather than asking one combined question covering discrimination and other possible motivations for Carnes' decision not to promote Akrabawi. The jury was asked two questions. First, the "discrimination" question: "Did defendant deny plaintiff Mike Akrabawi a

promotion to the Human Resources Assistant position because of his national origin?" Second, the "but for" question: "Would defendant have denied plaintiff's promotion to the Human Resources Assistant position even if plaintiff's national origin was not present?" The court and Carnes both justify this second question by pointing to *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1351 (7th Cir.1995), in which we construed 42 U.S.C. § 2000e–5(g)(2)(B) and endorsed the idea of a "verdict question containing a "but for" inquiry for the jury." We review the court's decision to use two questions for an abuse of discretion. *See Hibma v. Odegaard*, 769 F.2d 1147, 1157 (7th Cir. 1985).

Akrabawi relies on *Gehring v. Case Corp.*, 43 F.3d 340, 343–44 (7th Cir.1994), in which we urged district courts to give simpler jury instructions in discrimination cases. Akrabawi follows up on *Gehring* by arguing for a combined instruction. He contends that the separate questions confused the jury and resulted in an incomprehensible verdict. Akrabawi's argument carries some logical force if one understands "because" in the first jury question to mean "primarily because" or "solely because" rather than "in part because." Phrased differently, the jury verdict is contradictory if "because" means that discrimination was *the* cause for Carnes' decision. On the other hand, we can reconcile the mixed verdict if we read "because" to mean that discrimination was *a* cause for Carnes' decision. Since the jury verdict makes sense in light of the second reading, we find no error, but we don't endorse the questions asked as being models to emulate. The statute deals with the causation issue by using the term "motivating factor." Because the statute contains this language, district courts might be better advised to ask juries to determine whether discrimination was a motivating factor in a defendant's employment decision. Of course, such an approach would probably require an accompanying instruction defining "motivating factor." In the end, district judges must choose between simple verdict questions that run the risk of confusion and precise questions that might overwhelm a jury with jargon. And given the multiple fact scenarios that give rise to these sorts of problems in trials, we think it best to refrain from endorsing a one-size-fits-all way of resolving these issues.

Akrabawi's argument for a combined question runs up against a second problem: the statute. The thrust of § 2000e–5(g)(2)(B) is that employers may make decisions out of mixed motives. The statute addresses the complex nature of employment decisions by recognizing that a discriminatory employer might make exactly the same employment decisions absent improper bias because of legitimate considerations. Crucially, the statute allows the court to award certain relief—but not damages or reinstatement, promotion, etc.—in these cases. The statute demonstrates a congressional purpose to rectify discrimination even when it does not constitute the sole reason for an employment decision. To give effect to the statute, a court needs to find out whether discrimination constituted a motivating factor; but to determine the available remedies the court also needs to know whether the employer would have made the same decision absent discrimination. In other words, the statute seems to mandate two questions. Can these two questions be combined? Perhaps, but we don't see an easy way to achieve a consolidated query without causing more problems. Furthermore, we would hesitate in proposing such a consolidated jury question in the abstract for fear that we would impinge on the discretion of the district judge to formulate a verdict form that fits a particular case. As *Gehring* noted, "We do not want to tie the judge's hands; language works best if it responds to the nature of the precise dispute between the parties." Akrabawi correctly explains that *Gehring* urged a simple, single question; but *Gehring* involved the age discrimination laws and did not address the problem created by mixed motive cases or the "but for" defense. While *Gehring* inveighed against the use of "legalistic and ambiguous terms" in jury instructions, we explicitly stopped short of stating that a party is "entitled to the best possible instruction." 43 F.3d at 344.

One last word on this subject: Akrabawi may be right when he claims that separate instructions encourage juries to reach mixed

motive verdicts. If that is a problem, it is not one we can rectify. Its origin lies in the statute, not the jury instructions. Hypothetically, if a plaintiff were willing to forego the remedies laid out in § 2000e–5(g)(2)(B)(i), then it might be possible for the parties and court to agree on a single question disposing of the whole discrimination inquiry in one fell swoop. Since Akrabawi wanted a remedy under § 2000e–5(g)(2)(B)(i), we have trouble understanding why he complains too much about the mixed verdict.

■ Akrabawi's third complaint focuses on the trial judge's answer to a question from the jury. The jury asked about the "discrimination" question-which was question # 2 on the special verdict form. Specifically, the jury sent the following note: "Judge—Please clarify question # 2. Can we consider his national origin as the reason for delay in getting transcript." The judge responded:

> Members of the jury, in response to your question, Question No. 2 asks: Did defendant deny Mike Akrabawi a promotion to the human resources assistant position because of his national origin? In answering this question you are not to single out one instruction alone as stating the law but must consider the instructions as a whole, including the instruction entitled the Nature of the Claim, Essential Elements of Plaintiff's Claim under Title VII and Motivating Factor.

■ Akrabawi complains because he feels that the judge directed the jury away from the circumstantial evidence instruction which he claims was crucial to his chances of success on question # 3—the "but for" question. Akrabawi cites *United States v. Adcox*, 19 F.3d 290 (7th Cir.1994), and *United States v. Mealy*, 851 F.2d 890 (7th Cir.1988), for the proposition that district courts must answer jury questions with great caution. He argues that the judge's answer provided less clarity than required and that it steered the jury in the wrong direction. We review this claim for an abuse of discretion. *See Mealy*, 851 F.2d at 902.

The judge explained that his answer directed the jury to the instructions as a whole in compliance with *Mealy*. *See id.* at 901–02. While the judge could have stopped with his general reference to all the instructions, he did not commit reversible error by singling out the essential elements instruction. By referring the jury to the instruction that seems most applicable to question # 2, we do not believe the judge steered the jury *away* from the circumstantial evidence instruction. In addition, we note that the circumstantial evidence instruction provided such vague direction that we do not think it dramatically helped Akrabawi's case. Finally, the jury asked about question # 2 and Akrabawi prevailed on the answer to question # 2. Thus, he would need to show a connection between the judge's answer to this question and the jury's unfavorable verdict on the "but for" question. He has made no such showing.

■ Both parties claim that the court erred by not awarding them attorneys fees. Akrabawi contends that 42 U.S.C. § 2000e–5(g)(2)(B)(i) mandated fees because he proved discrimination even if he did not prevail overall. The judge treated the question of fees as a matter for the court's discretion and refused to award fees to Akrabawi. We review any issues of statutory interpretation *de novo*. If the statute commits the question of fees to the court, we review the judge's decision for abuse of discretion—the same standard we would employ for other attorney fee questions under Title VII. *See Merriweather v. Family Dollar Stores of Indiana, Inc.*, 103 F.3d 576, 582 (7th Cir.1996).

The leading decision on the subject of fees in "mixed motive" cases appears to be *Sheppard v. Riverview Nursing Center, Inc.*, 88 F.3d 1332 (4th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 483, 136 L.Ed.2d 377 (1996). In *Sheppard* the Fourth Circuit held that the statute committed the question of fees to the discretion of the district court. In other words, the statute did not mandate an award of fees based on every finding of discrimination. The *Sheppard* court approached the problem as a mundane task of statutory reading: "The statute ... provides that a court 'may' grant attorney's fees. The word 'may' means just what it says: that a court has discretion to award (or not to award) attorney's fees.... Plainly, if Congress had wished to require recovery of at-

torney's fees, it would have provided that courts 'shall' grant fees instead of that they 'may' do so." *Id.* at 1335. The court continued by explaining that interpreting the statute to provide discretionary attorneys fees does not render the law "ineffective" or "practically meaningless." *Id.* at 1336. The court reached this conclusion because discretionary fees allow a court to offer some consolation to a plaintiff who suffered discrimination, while simultaneously not mandating a windfall for a plaintiff whose own misconduct eclipsed the discriminatory conduct.

The *Sheppard* court next turned its attention to "the considerations that should inform a court's exercise of that discretion." *Id.* at 1335. The Fourth Circuit relied on *Farrar v. Hobby*, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), for guidance. *Farrar* laid out the standards for awarding attorney's fees under 42 U.S.C. § 1988 to a civil rights plaintiff who prevailed but won only nominal damages. The *Farrar* Court identified two inquiries. First, a court must determine whether the plaintiff has crossed the statutory threshold for fees. And second, assuming that the plaintiff is eligible, the court must consider the relationship between the fees and the degree of the plaintiff's success. *See id.* at 114–16, 113 S.Ct. 566. The *Sheppard* court explained that the first inquiry depended on the particular statute but that the second inquiry provided crucial guidance for any court deciding whether to award discretionary attorney's fees. *See Sheppard*, 88 F.3d at 1336. The *Sheppard* court went on to develop a list of factors for courts to consider in weighing whether to award fees:

> When assessing whether to grant fees, *Farrar* requires that courts consider the relationship between the fees and the degree of the plaintiff's success.
>
> ... In appropriate cases, for instance, courts should consider the reasons why injunctive relief was or was not granted, or the extent and nature of any declaratory relief. Moreover, *Farrar's* concern was not only with whether the extent of recovery accords with the amount of attorney's fees. The decision suggested a more general proportionality consideration as well:

whether the public purposes served by resolving the dispute justifies the recovery of fees.

> ... By definition, an illicit factor will have played some role in cases subject to § 2000e–5(g)(2)(B). But within that category of cases, there are large differences. Some mixed-motive cases will evidence a widespread or intolerable animus on the part of a defendant; others will illustrate primarily the plaintiff's unacceptable conduct which, by definition, will have justified the action taken by the defendant.

*Id.* (citation omitted). In its conclusion, *Sheppard* reiterated that courts should weigh "the circumstances of each case in fashioning any award of attorney's fees—indeed, one of the relevant factors is the extent to which a plaintiff succeeds in showing that an employer's discrimination, and not the employee's own misconduct, drove the employment decision." *Id.* at 1339.

We agree with *Sheppard's* analysis of the statute and we believe the list of factors is a good starting point for a court deciding whether to award attorney's fees under § 2000e–5(g)(2)(B). The trial court relied on *Sheppard* and refused to grant Akrabawi's request for fees. It rejected an award because Akrabawi met with only very limited success in showing Carnes' discrimination. The judge explained that the jury verdict demonstrated that Akrabawi's own conduct played a larger role in Carnes' decision than did any discrimination. In short, the judge chose the correct law, and we think his analysis of the facts is dead on. This case is a prime example of a situation in which the evidence of invidious discrimination is minimal and the evidence of employee misconduct is serious. In cases like this one, it seems completely appropriate for a district judge to forego awarding fees.

 Carnes' request for fees fares little better. In a nutshell, Carnes argues that, as the prevailing party in a groundless action, it deserves fees. *See* 42 U.S.C. § 2000e–5(k). This argument is a loser. Akrabawi won a jury verdict on discrimination. We agree with the jury that Cichon made remarks that seem to evince animus based on Akrabawi's national origin. Admittedly

Carnes had an excellent case on the "but for" defense, but Akrabawi's arguments on the "but for" issue were not meritless. He claimed that Carnes did have verification of his college degree in the fax from the Aerospace Institute. Akrabawi elaborated by arguing that only discrimination explained why Carnes refused to consider this information. Akrabawi claimed he did not lie to Carnes—and the jury verdict on the misrepresentation claims arguably means that he prevailed on this point. While Akrabawi's suit was no lead pipe cinch, it wasn't baseless, either. Furthermore, defendants should receive fees in Title VII cases only in fairly extreme circumstances. *See Eichman v. Linden & Sons, Inc.*, 752 F.2d 1246, 1248 (7th Cir. 1985). Carnes failed to show that Akrabawi brought a frivolous or unreasonable case. Carnes also produced no evidence that Akrabawi acted in subjective bad faith. Therefore, we agree with the district judge.

■ Next, Carnes claims that the jury erred in finding for Akrabawi on its misrepresentation claims. The jury found that Akrabawi did not make a misrepresentation to Carnes concerning his educational background in his efforts to obtain the human resources job. Specifically, the jury answered "no" to the following question: "Did plaintiff make a misrepresentation of fact to defendant concerning his educational background with respect to the Human Resources Assistant position?"

At first, Carnes appears to have a point. Cairo University is the Harvard of the Middle East. Ain Shams University is for real, but (as Lloyd Bentsen might say) it certainly is no Cairo University. In an attempt to quantify the difference between the two schools, we searched newspaper articles on Westlaw and found ten times the number of stories mentioning Cairo University than Ain Shams University. In other words, Cairo University has almost ten times the cachet of Ain Shams. Akrabawi counters Carnes by explaining his theory of the case:

> Akrabawi put "Cairo University" on his application for the human resources position. He did this for two predominant reasons. First, "Ain Shams" is an obscure term, whereas "Cairo" is a term with which employers are familiar. So, Akrabawi listed Cairo University to limit confusion. Second, Ain Shams is a university in Cairo, rendering his response on the application fundamentally accurate. He knew that he could clarify his answer in an interview process if the issue arose.

Carnes dropped the ball if it couldn't refute this thin argument. Akrabawi also notes that filling the human resources position involved more than just the application. Akrabawi thus implies that the jury might have felt that his oral clarifications of the application erased any misrepresentations contained in the application alone. While we may not buy what Akrabawi is selling, we are not in a position to assess his credibility. The jury simply chose to believe Akrabawi on this point. The district court explained that because the jury heard evidence that plausibly could support Akrabawi's theory, it should not topple the verdict. *See Knox v. Indiana,* 93 F.3d 1327, 1332 (7th Cir.1996). We agree. The jury verdict stands.

■ Finally, Carnes complains that the district court improperly excluded the evidence of the Egyptian investigator who found that Akrabawi did not graduate from Ain Shams in 1968. Carnes argues that the court should have admitted the statement of Soliman under the hearsay residual rule, F.R.E. 803(24) (now F.R.E. 807). We begin by noting this circuit's emphasis on narrowly construing the residual provision to prevent it from becoming the exception that swallows the hearsay rule. *See United States v. Sinclair,* 74 F.3d 753, 759 (7th Cir.1996). In addition, we review only for abuse of discretion. *See id.* at 758. Thus, Carnes steps up to the plate on this issue with two strikes already called.

The district court explained that it found Soliman's testimony suspect at best. The judge also found that Soliman's statement was not more probative on the point for which it was offered than other evidence. We understand the judge's thinking on each point. He explained his reluctance to create a residual exception allowing an attorney or a paralegal—rather than the actual custodian of records—to testify to the negative results of an investigation. We agree with the

judge. Carnes apparently tried to bootstrap an inadmissible letter from Ain Shams University by nesting the contents of that letter within Soliman's statement. We also note that Carnes introduced Akrabawi's INS records—documents written by Akrabawi that contradict his own claim of having attended Ain Shams University during the late 1960's. This seems like better evidence of Akrabawi's alleged misrepresentations than Soliman's statement. Therefore, we do not believe that the judge abused his discretion by excluding Soliman's testimony.

For the foregoing reasons, we AFFIRM.