**BAXTER HEALTHCARE CORP.,**
Plaintiff–Appellant, Cross–
Appellee,

v.

**HEALTHDYNE, INC., Defendant–**
Appellee, Cross–Appellant.

No. 90–8370.

United States Court of Appeals,
Eleventh Circuit.

Oct. 22, 1991.

**42.** *Id.*

David S. Currie, Charles A. Ratz, Gray, Gilliland & Gold, Atlanta, Ga., for plaintiff-appellant, cross-appellee.

William A. Clineburg, Jr., Daniel James King, King & Spalding, Atlanta, Ga., for defendant-appellee, cross-appellant.

Before KRAVITCH and EDMONDSON, Circuit Judges, and GODBOLD, Senior Circuit Judge.

GODBOLD, Senior Circuit Judge.

Baxter, known throughout this case as Travenol, is primarily engaged in the sale of disposable hospital products including distilled water. It desired to obtain and to market a humidifier system that would warm and humidify the air breathed by hospitalized patients with impaired breathing capabilities who were connected to respiratory therapy systems. The humidifier would be composed of a disposable canister in which liquid would be vaporized, an electronic controller that contained a heat exchanger to transfer heat to the canister, temperature controls, and a system to automatically control the flow of liquid into the canister. Travenol desired to supply the canister to the humidifying system and to obtain the other components in a unit to be supplied by a vendor. It expected that the unit would utilize disposable canisters and distilled water to be supplied by Travenol within its historic function as a supplier of disposable medical products.

In 1980 Travenol entered into a written contract with Healthdyne for it to develop and manufacture the controller unit. Travenol supplied specifications that covered the nature and functions of the unit, performance standards, and, in a general sense, its design. As a more specific design was developed within the general scope, and testing was conducted, and manufacturing began, both parties were involved in numerous ways. Changes and modifications were made by each party and shortcomings identified and corrected. Testing was done by both parties. Some safety tests that the contract provided were to be made by Healthdyne were, with the consent of both parties, made by Travenol, and Travenol conducted other tests

on its own. As the trial judge later described it, Travenol's participation in the product was "continuous" and "pervasive." One of the matters discussed was protecting against an overflow of liquid into the canister that might result in excess moisture being passed on into the lungs of the breather/patient. A part of this matter concerned whether, since the controller was electronically operated, it might overfill as a consequence of a momentary loss or diminution of electric power ("brownout"), or a power surge. There was dialogue between the parties concerning whether the specifications supplied by Travenol properly addressed operation in conditions of momentary power problems. Eventually the matter of overfill as a consequence of electrical power incidents became central to this case.

Beginning around 1983 Travenol ordered from Healthdyne and placed with its customers a total of approximately 1,750 units. Travenol described at trial difficulties with, and shortcomings of, the units, and customer complaints and dissatisfaction. There was an abnormally high rate of customer returns for repairs, involving numerous defects—examples included alarms malfunctioning, fuses burning out, loose screws, failures of power, clamps not functioning properly, loose and badly insulated wires and wires not soldered, parts missing. Some of these faults were common to more than one unit, others not. A Travenol official described these failures, however, as "nuisance failures."

As early as 1982 Travenol had begun negotiations with Sharp, another manufacturer, to produce a "second generation" controller. There was evidence that this search for a new source began with dissatisfaction with the quality of the Healthdyne unit, other evidence that Travenol was disenchanted with Healthdyne price increases and was seeking a unit that cost less.

In May 1985 Travenol became aware of a new problem that affected patient safety. It received a report of a life-threatening incident in Chicago, involving an infant user whose lungs filled with liquid, causing the child to go into cardiac arrest. Travenol's investigation led it to conclude that the unit might overfill during a momentary "brown-out", or power surge, causing liquid to pass into the user's lungs. Because of this risk involving patient safety Travenol concluded that it must retrofit all units to cure the overfill problem.

Travenol and Healthdyne discussed mechanical means, and alternatively software means, that would fix the possibility of overfill. Travenol itself designed a modification that its designer described as "repeatable in manufacturing and ... reliably accurate in functionality over the remainder of the product life." The parties developed suggested costs of proposed mechanical alternatives. Travenol made a decision that it would not recall the units but would "modify" or fix them. It sent its customers a notice, telling of the possibility of overfilling during power outages and stating that instructions would be sent for returning units for retrofitting to cure this problem. The notice gave instructions on safety procedures to be followed pending retrofitting. It made no reference to any other problem. When this notice was sent the warranty period on approximately one-third of the units had expired. Travenol notified the Food and Drug Administration of the problem and told FDA it would "fix the unit." While these events were going on Travenol was talking with Sharp about its manufacturing controller units. On May 30, 1985, the same day Travenol notified FDA it would retrofit the Healthdyne units, it was in correspondence with Sharp in Japan inquiring how quickly it could manufacture units and in what volume.

Travenol called on Healthdyne to be responsible for retrofitting costs. It wrote to Healthdyne:

The manufacturing phase of the program has continually been plagued by poor workmanship, slow turnaround in serviced units, and a lack of repair parts. It is now time for Healthdyne to step up and accept their responsibility to implement quickly and accept the cost of the rework. It will be significantly less costly for Healthdyne to perform the rework

on their own as opposed to Travenol doing the work and recovering the cost from Healthdyne. This issue must be resolved quickly so that we may advise our HLC 37 users as to how and where to send units for rework. Please respond at the earliest possible date.

Healthdyne refused. Travenol made arrangements with Sharp for new units that contained many of the same features as the Healthdyne units.[1] Some Healthdyne units were retrofitted pursuant to the notice sent out by Travenol. Ultimately Travenol took all of them back and replaced all with Sharp units.

Travenol sued Healthdyne asserting breach of contract and implied warranty. It claimed damages consisting of research and development payments that under the contract it had paid to Healthdyne, full repayment of the purchase price for all units, and costs it incurred pursuant to its notice to customers. Healthdyne counterclaimed seeking $45,757 unpaid expenses relating to manufacture of the controller, unpaid invoices for parts and equipment relating to the controller of $35,908.81, and unpaid invoices for miscellaneous parts and equipment not related to the controller of $23,140.87.

At trial Healthdyne moved for a directed verdict. The trial judge ruled:

> I now rule that I will not give to the jury anything other than common law contract, because I now make the finding that Travenol's—plaintiff's participation in this product was so continuous and so pervasive that it puts it out of the context for the U.C.C. or even for a derivative of the liability without the [sic] fault negligence doctrine, which is what the plaintiff has attempted to plead. And so it will go to the jury on contract only.
>
> I find that the relationships between the parties are so complex that only a contract drawn by them and interpreted by them is capable of giving fair and full implementation to whatever—to the rainbow of their intentions as a change [sic] throughout the process.

The case went to the jury on Travenol's contract claim and Healthdyne's counterclaim. The jury returned a verdict for Travenol of $1.5 million and a verdict for Healthdyne of $59,000 on its counterclaim. The court granted Healthdyne's motion for judgment n/o/v, holding:

> The Court hereby enters judgment N.O.V. for defendant and against plaintiff for the difference between the jury award of $1,500,000 and $301,000—*i.e.* the Court reduces the amount by $1,199,-000. The Court finds the lesser figure to be the maximum amount the record will support for cost repair as the measure of damages mandated by controlling Illinois law, *Midland Supply Company v. Ehret Plumbing & Heating Co.*, 108 Ill.App. 3rd 1120 [64 Ill.Dec. 601, 605], 440 N.E.2d 153, 157 (1982), it being conceded by both sides that the units involved could be repaired, as was done in the case of similar units manufactured by another company for plaintiff.

Travenol's motion for judgment n/o/v[2] directed against the counterclaim was denied. Travenol appeals and Healthdyne cross-appeals.

## I. *Healthdyne's cross-appeal*

### (A.) The motion for directed verdict

There is no merit to Healthdyne's theory that it was entitled to a directed verdict. The evidence presented a classic case for jury determination of whether Healthdyne breached the contract with Travenol, and the jury decided that Healthdyne did.

### (B.) Admission into evidence of customer complaints

The district court did not abuse its discretion in admitting into evidence over objection records compiled by Travenol of customer complaints concerning the units. Mary Pat Bushnell was the Travenol em-

---

**1.** The Sharp unit suffered from the same overfill problem as the Healthdyne units, and Travenol paid Sharp to remedy this.

**2.** Actually this was a motion for new trial on the counterclaim with an alternative motion to amend the judgment with respect to the counterclaim, but the judge referred to it as a motion for judgment n/o/v.

ployee responsible for receiving and documenting customer complaints relating to a number of products, including the controller at issue. She testified that she talked to "health care professionals at the [user] hospitals, to document the incident of the report, receiving information about the patient ... and ultimately what consequence came to the patient as a result of the reported incident with the device." She testified that she prepared the reports as part of the regular course of her employment, at or near the time of the incidents discussed in the reports, and based on information transmitted to her by persons with knowledge of the incidents reported. Bushnell also testified that the persons who reported the incidents to her were respiratory specialists responsible for monitoring or using the controller, that they reported the incidents in the course of their regularly conducted business, and that they made these reports to Travenol in order to document that there was a problem with the device, to protect their patients' safety and to make sure Travenol was aware of any problems concerning the controller.

■ The documents were admissible under Federal Rules of Evidence 803(6). Primary emphasis of this rule is on the reliability or trustworthiness of the record sought to be introduced, and the trial judge has broad discretion in determining admissibility. *U.S. v. Veytia–Bravo,* 603 F.2d 1187, 1189 (5th Cir.1979), *cert. denied* 444 U.S. 1024, 100 S.Ct. 686, 62 L.Ed.2d 658 (1980); *see also Saks International, Inc. v. M/V Export Champion,* 817 F.2d 1011, 1013 (2nd Cir.1987). Documents may be admitted under 803(6) even though they are records of a business entity other than the proponent, and there is no requirement that the person whose first-hand knowledge was the basis of the entry be identified, so long as it was the recording entity's business practice to obtain such information from persons with first-hand knowledge. *See U.S. v. Atchley,* 699 F.2d 1055, 1059 (11th Cir.1983); *Saks,* 817 F.2d at 1013.

Rule 803(6) does not eliminate a double hearsay problem unless the informant's statement also conforms to one of the exceptions to the rule against hearsay. *See* 4 *Weinstein's Evidence,* 803(6)[04], p. 803–190–91. "Each participant in the chain producing the record—from the initial observer-reporter to the final entrant—must be acting in the course of this regularly conducted business, or must meet the test of some other hearsay exception." *Id.* at 803–185–86.

■ Travenol produced uncontradicted testimony sufficient to establish the elements required to admit the reports. The Travenol reports themselves are business records. Bushnell laid a business record foundation for the customer complaints that formed the first link in the chain. Compare *T. Harris Young & Assoc. v. Marquette Electronics, Inc.,* 931 F.2d 816, 826–28 (11th Cir.1991), an antitrust and tortious interference with business case, in which the court held that testimony by employees of plaintiff distributor concerning their telephone conversations with potential customers was inadmissible hearsay. *Id.* at 826–28. The employees testified that hospital employees told them that they would have bought plaintiff's products but for defendant's repeated statements that use of plaintiff's products would void the hospitals' warranties on machines manufactured by defendant. Plaintiff's employees allegedly conducted a telephone survey of hospital employees and wrote down the responses they received, but left out many of the particulars of these conversations. The court held that this evidence did not constitute business records under Rule 803(6), because the out-of-court declarants (the hospital employees) were not acting in the regular course of business when they spoke with plaintiff's employees. *Id.* at 828. In the case before us hospital employees with whom Travenol spoke contacted Travenol to report a serious defect in a product that was endangering their patients. These reports carried higher indicia of reliability than the statements in *T. Harris Young,* which were solicited by the proponent of the testimony and involved mundane supply matters.

Because we conclude that the documents were admissible under Rule 803(6) we need not consider whether they were admissible under Rule 803(24).

## II. *Travenol's appeal*

### (A.) Damages

■ The court submitted to the jury the issue of damages and included this in its instruction:

As a general rule, where a product does not function as required by the contract, the appropriate measure of damages is the cost of repairing the product so that it will function as required. There is an exception to that general rule in those instances in which the product in question has failed on numerous occasions in numerous ways to function as required by the contract, so that the product is not entirely susceptible of repair and is worthless or of no value to the purchaser. In such cases you may but are not required to find that the proper damages is the purchase price for the product.

The district court did not err in holding that the award of $1,500,000 must be set aside as not supported by the evidence. We conclude, however, that the award of $301,000, which the court found was "the maximum amount the record will support for cost of repair," must be vacated and the case remanded to the district court for reconsideration of the maximum amount of damages supported by the evidence and entry of a fresh judgment. Reaching these conclusions embraces several inquiries.

First, does the evidence support damages in the amount of the entire purchase price pursuant to the "worthless product," or so-called "lemon," instruction? We consider this issue under the familiar standards of *Boeing Company v. Shipman*, 411 F.2d 365 (5th Cir.1969): considering all the evidence within the light and with all reasonable inferences favorable to the party opposing the motion, do the facts and inferences point so overwhelmingly in favor of one party that reasonable jurors could not arrive at a contrary result? Applying this standard, we hold that the court did not err in its necessarily implied holding that the evidence did not support damages for the full purchase price.

The trial judge instructed the jury that it could find that the proper damages were the purchase price of the product if it had failed on numerous occasions in numerous ways to function as required by the contract so that it was not entirely susceptible of repair and was worthless or of no value to the customer. Neither party contends that this instruction was incorrect. We have described some of the problems encountered with the units prior to the spring of 1985. Also, Travenol officials quoted Healthdyne's president as saying the product was an embarrassment to his company, that it was brought on by expansion and new people, and that he would put his "first team" on the problems. But until the spring of 1985 these problems were not treated as non-repairable, although damaging to Travenol's reputation and customer relations and embarrassing to Healthdyne. But in a mechanical sense they were subject to repair and were being repaired, though not always to Travenol's satisfaction. The Chicago incident was of a different nature because it revealed a life threat to patients. Procedures to repair for this problem were explored and were found to be feasible, and estimates of repair costs were developed. Travenol notified its customers, and the FDA, that the units would be retrofitted. A decision to replace units came later.

Matters between Travenol and Healthdyne derailed not on whether in a mechanical sense the units could be satisfactorily repaired but over who was going to pay the bill. At trial Travenol officials described the units in conclusory terms as "worthless," "junk," "lemons," "not repairable," and the like. But there is no substantial evidence that before the Chicago incident the units were treated as unrepairable. When the life-threatening overfill problem surfaced Travenol considered the option of a repair ("retrofit") to fix that problem, chose that option, gave notice of its choice to customers and government, then reconsidered when it found that Healthdyne

would not bear the cost. Its officials testified that, bearing in mind previous problems and the consequences of them, and the overfill problem that involved patient safety, and its feeling that the repaired units would not be satisfactory, it was not willing to invest $600,000 in retrofitting.

We must consider the extent, if any, that a purchaser's unwillingness to invest in the cost of feasible repairs is an element of the legal test for worthlessness. We do not hold that the concept of a "worthless product," as described in the court's instruction to the jury, wholly excludes consideration of the costs that the purchaser must incur to make the product acceptable. But the unwillingness of a purchaser of goods to advance repair costs (and if necessary sue for recovery of those costs), or not to advance, cannot subsume worthlessness. Were this so any purchaser at its option could convert any defect into worthlessness and transmute normal contract damages into what amount to restitution damages without tendering back the goods. We do not attempt to write a plenary rule for all cases. We only hold that in this case the totality of the evidence—the argument over the repair bill, taken together with other legitimate dissatisfactions and expectations, is not of such dimension that we can say the district court was in error in finding that the evidence did not adequately support worthlessness. The judge's order is cryptic, but it reveals two significant elements. Despite Travenol's contention to the contrary, that it did not "concede" repairability, the parties were in agreement

that the overfill problem was, in a mechanical sense, fixable.[3] And, as we discuss below, the evidence does not support Travenol's assertions that it would have cost $600,000 to make the necessary repairs, an amount it was unwilling to invest.

Second, did the jury verdict for $1.5 million necessarily include damages repaying all or part of the purchase price and to an extent that exceeded repair costs? Travenol sued claiming the purchase price, research and development costs it had paid to Healthdyne pursuant to the contract, and the costs of recall. Its evidence showed that it paid Healthdyne $1,429,422 for purchase price, $222,403.64 for research and development, $71,804.38 for parts for the controller units, and it incurred expenses of $65,000 for recall, producing a grand total of $1,788,630. This is the amount that Travenol contended to the jury it was entitled to. There were no special interrogatories.

We are unsure what the jury decided with respect to the R & D costs, the claim for parts, and the $65,000 described as recall expenses. During the charge conference the trial judge told counsel that Georgia law controlled on damages and that it did not permit recovery of consequential damages in contract cases. A dialogue ensued concerning whether the $65,000 item (and possibly the costs for R & D and parts—this is not clear) were recoverable contract damages or not. We set out in the margin the relevant portion of the instructions to the jury.[4] The judge followed

---

3. On appeal Travenol's brief states that it determined that the overfill problem "could be repaired at some cost." Brief p. 14.

4. As a general rule, thus, the damages to which one party to a contract is entitled because of a breach thereof by the other are such as arise naturally from the breach itself or such as may reasonably have been supposed to have been within the contemplation of the parties at the time of the making of the contract as a probable result of the breach itself.
   If you find for the plaintiff with respect to this matter on other issues, and I do not suggest which way you should find, with respect to this question of what was within the contemplation of the parties, you may look to

the terms of the contract itself which in at least two paragraphs, as the court remembers, paragraphs 8 and 12, lists such things which you can necessarily know were in their contemplation. Whether they are applicable to the situation or not the court implies no opinion at this time.
   Also, the parties will be presumed to have contemplated that the party injured by the breach of the contract would sustain such damages as would fairly and substantially and in the usual course of things result from such breach and in the light of all the facts known or which would have been known to them at the time of entering into the contract. It is not required, of course, that the consequences must be such, before they are subject to be recovered in damages, that the parties at the

this with the instruction quoted above in text concerning the measure of damages where a breached contract involves the furnishing of goods or services.

The order granting judgment n/o/v refers only to repair costs. We do not know whether the judge considered R & D, parts, and recall costs as items not recoverable as a matter of law, or whether he thought they were not supported by the evidence, or whether he overlooked them. Travenol does not contend that the verdict did not exceed repair costs for the overfill problem but rather that the evidence supported a verdict for the full purchase price and that the court erred in holding otherwise. The court can address these uncertainties on remand.

Third, what is the correct measure of repair costs? For repairing each unit, Healthdyne included cost of materials, freight, set-up costs, documentation, overhead, labor at $5.40 per hour for 7.12 hours, plus a profit figure of 20%. The result was an actual cost figure for all units of $310,856. This must, however, be adjusted downward because Healthdyne calculated these costs on an estimate of 1,800 units to be repaired when the actual number was 1,750. Adjusting for this, the actual cost is $302,245.

Travenol contends that once the district court set aside the award of $1,500,000 it should have used as the maximum amount supported by the evidence repair costs calculated by Travenol, amounting to some $658,000.[5] Except for the adjustment noted above, the calculation adopted by the district court was correct. Travenol's calculation contains a fundamental flaw. It included a labor charge (for the same number of hours per unit estimated by Health-

dyne) of $50 per hour. Travenol's witness who prepared the estimate explained the $50 per hour as his company's "hourly service rate," which he described as a "service rate as opposed to a manufacturing rate," and he "assumed" that this rate was to be utilized. Use of this rate instead of labor cost caused Travenol's estimate of per unit repair costs to be more than double the cost estimated by Healthdyne. The "service rate" is the major item in the cost differential between Healthdyne's $300,000 plus and Travenol's $600,000 plus. Damages measured by repair costs were not supported by the calculation based upon the rate that Travenol charged its customers for service. That rate was not identified by the calculation itself or by oral testimony as related to cost.[6]

### (B.) The jury instructions on Healthdyne's counterclaim

Healthdyne counterclaimed seeking $45,757 for unpaid expenses relating to manufacture of the controller, unpaid invoices for parts and equipment relating to the controller of $35,908.81, and unpaid invoices for miscellaneous parts and equipment of $23,140.87. The jury returned a general verdict on the counterclaim for $59,000.

Evidence showed unpaid invoices for miscellaneous parts and equipment totalling $22,978. Travenol does not contend that this was not recoverable.[7] Travenol contends that any amount beyond $22,978 could not be recovered because the remaining two amounts represent damages against Travenol for breach of the contract with Healthdyne. Healthdyne was found

---

time of entering into the original contract which is being considered may fairly be supposed to have considered or at least would have considered as flowing from the breach of the contract if they had been informed of all the facts, those matters which are suggested to you.

**5.** Travenol did not claim lost profits. It did not introduce specific evidence of damages arising from problems or defects other than the overfill retrofit, except as any such items might be embraced in parts, R & D, and costs of recall.

**6.** Another Travenol witness testified that he had "heard" that Travenol estimated a per unit repair cost of $200 (as compared with Healthdyne's per unit repair cost of $172) and the calculation relied upon by Travenol of $376 per unit.

**7.** Possibly the jury included in its award the $22,978 claim plus the $35,908.81 for parts and equipment relating to the controller, which items total $58,886.81, and excluded the claim for $45,757 for unpaid expenses related to manufacturing the controllers.

by the jury to have breached the contract, and indisputably it was the first to breach, therefore, Travenol says, Healthdyne may not recover damages for subsequent breaches by Travenol.

Travenol raised this point by requesting the court to give this instruction (No. 62):

Defendant has brought a counterclaim against Plaintiff for breach of the parties' contract. However, Defendant cannot recover on its counterclaim for breach of contract if you conclude that Defendant breached the contract first. In other words, a party to a contract who commits the first breach of the terms of the contract cannot maintain an action against a subsequent breach of the other party. *Kosuga v. Kelly,* 257 F.2d 48 (7th Cir.1958); *Goldstein v. Lustik,* [*Lustig* ], 154 Ill.App.2d [3d] 595 [107 Ill.Dec. 500], 507 N.E.2d 164 (1987).

In the trial conference the district judge explained that he was refusing to give this charge because it used the term "the contract." Counsel for Travenol responded: " 'the' contract includes the purchase of all parts that are provided for in the original contract itself and the purchase of units and part of their counterclaim includes parts from that contract."

The written contract between Travenol and Healthdyne contained this provision.

To enable TRAVENOL to repair the Controller, HEALTHDYNE now agrees to sell spare parts to TRAVENOL, at its customary prices, for a period of 8 years after the effective date of this Agreement. HEALTHDYNE'S responsibility for spare parts is limited to parts for which HEALTHDYNE has the ability to manufacture and procure.

The order of the district court denying Travenol's motion for judgment n/o/v sheds additional light on what the judge had said at the charge conference:

The Court DENIES plaintiff's motion for judgment N.O.V. finding the principles set forth in plaintiff's request to charge No. 62 (not given by the court) inapplicable to the facts in the case where the breach proved by defendant is in the plaintiff's refusal to pay.

There was an agreement to develop and produce the units, with a provision for future sales by Healthdyne of spare parts, with a commitment express or implied by Travenol to pay for such spare parts if and when ordered. Healthdyne's obligation to sell spare parts was not limited to parts needed for causes that could be attributed to Healthdyne. The district judge was correct in recognizing that Travenol's commitment, express or implied, to pay for spare parts in the future was an independent undertaking and that the overly simple statement in the proposed charge was not applicable to the facts in this case.

### III.

Summarizing, we hold that Travenol was entitled to damages of at least the repair cost, which, pursuant to the adjusted figure set out above, is $302,245. We leave to the district court to address whether the maximum damages supported by the evidence also include damages to Travenol for R & D, parts, and cost of recall—any or all—and if so in what amount. And we hold that the verdict of $59,000 for Healthdyne on its counterclaim must be affirmed.

AFFIRMED in part, VACATED in part, and REMANDED.