Michelle BROWN, Plaintiff
Below, Appellant,

v.

LIBERTY MUTUAL INSURANCE
COMPANY, Defendant Below,
Appellee.

No. 115, 2000.

Supreme Court of Delaware.

Submitted: April 3, 2001.
Decided: June 13, 2001.

Douglas B. Catts, Esquire (argued), and Donna L. Harris, Esquire, of Schmittinger & Rodriguez, P.A., Dover, Delaware, Attorneys for Appellant.

Nancy Chrissinger Cobb, Esquire (argued), and Christopher T. Logullo, Esquire, of Chrissinger & Baumberger, Wilmington, Delaware, Attorneys for Appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER and STEELE, Justices, constituting the Court en Banc.

VEASEY, Chief Justice.

The pivotal issue in this case is the admissibility of hearsay evidence. Here, the trial judge excluded evidence of a physician's office notation offered by a patient-claimant for the purpose of showing that the claimant's insurer refused in bad faith to pre-authorize a necessary medical procedure. Having excluded this crucial evidence for the claimant's intended purpose while admitting it for other limited purposes that were not applicable to support a finding of bad faith refusal to authorize required medical treatment, the Superior Court entered judgment as a matter of law in favor of the insurer. The claimant appeals.

Although our analysis of the application of the rules of evidence differs from that of the trial judge, we affirm the judgment of the Superior Court. The trial judge did not abuse his discretion in excluding the evidence for the purpose offered. Accordingly, there was insufficient evidence to go to the jury on the bad faith claim.

### Facts

During the course of her employment at the Country Pantry Restaurant, Michelle Brown developed carpal tunnel syndrome in her right arm as the result of an industrial accident in October 1993. Brown underwent two surgeries to correct the problem in November 1993 and October 1994, but her condition did not improve significantly. These procedures were ultimately paid for by Country Pantry's workers' compensation insurer, Liberty Mutual Insurance Company.

By May 1995, Brown's condition had taken a turn for the worse, and Brown's primary physician, Dr. Richard DuShuttle, diagnosed her with causalgia in her right hand.[1] Based on this diagnosis, Dr. Du-Shuttle referred Brown to Dr. Janine Islam, a pain management specialist. On May 12, 1995, Dr. Islam, in turn, recommended that Brown see Dr. Eugene Godfrey to receive stellate ganglion nerve blocks to prevent further deterioration of Brown's condition.[2] Brown's doctors were particularly concerned that her causalgia could develop into reflex sympathetic dystrophy ("RSD"), a debilitating condition in which the patient experiences severe pain and hypersensitivity in the affected extremity.

In his testimony outside the presence of the jury, Dr. DuShuttle stated that the billing department in his office contacted Liberty Mutual several times between June and October of 1995 to obtain pre-authorization for the nerve block treatments. Dr. DuShuttle also stated that, at some point during this period, a billing clerk informed him that Liberty Mutual refused to pre-authorize treatment for Brown.[3] During Brown's October 7, 1995 office visit, Dr. DuShuttle then made the following notation in Brown's medical records: "The insurance company would not approve the stellate ganglion blocks which Dr. Islam recommended." According to Brown, Dr. Godfrey would not administer the nerve block treatment without pre-approval by an insurer.

Without the prescribed nerve blocks, Brown's condition deteriorated rapidly and, by October 1995, Brown had developed RSD.[4] In December 1995, Dr. David Sowa, Liberty Mutual's medical expert, examined Brown and agreed that she had developed RSD and that she urgently required nerve block treatments. According to Dr. Sowa, the RSD had produced "severe deformity, disability and pain of [Brown's] right upper extremity." In his report, Dr. Sowa also mentioned that Brown's insurer had not approved the nerve block treatments that he and Brown's other physicians had recommended based on their earlier examinations of Brown.

Brown filed suit against Liberty Mutual in May 1997 on three grounds, including a contract claim alleging that Liberty Mutual had breached the implied covenant of good faith and fair dealing by refusing pre-authorization for the nerve block treatments. The Superior Court granted Liberty Mutual's motion for summary judgment on all issues except the breach of contract claim.[5] Brown does not challenge this decision on appeal.

Before trial, Liberty Mutual also filed a motion *in limine* requesting that the Superior Court exclude, among other things, the notation in Brown's medical records

1. Causalgia is a condition marked by a burning pain in the hand or foot generally caused by a nerve injury.

2. Nerve block treatments consist of a series of injections into the sympathetic nerve. The injections reduce pain in the affected area and thus permit the patient to engage in a wider range of activities.

3. Dr. DuShuttle could not recall when the billing clerk reported to him. The billing clerk in Dr. DuShuttle's office did not testify because no one could identify the clerk who

spoke to Liberty about Brown's claim and who reported to Dr. DuShuttle. Therefore, there was no direct evidence and no notation by a clerk of any such conversation.

4. Specifically, between May and October 1995, the impairment in Brown's arm increased from 12% to 70%.

5. *See Brown v. Liberty Mutual Ins. Co.,* Del.Super., C.A. No. 97C–05–023, 1999 WL 1143325 (Aug. 20, 1999) (Mem.Op.).

concerning Liberty Mutual's alleged denial of approval for nerve block treatments and Dr. DuShuttle's related testimony concerning the alleged contact between his office and Liberty Mutual. Liberty Mutual argued that this evidence is barred by the rule against hearsay. The court held that Dr. DuShuttle's notation was not admissible under exceptions to the hearsay rule to prove the truth of the assertion that Liberty Mutual knew that the treating physician required pre-approval and that Liberty Mutual refused. The trial judge admitted the notation only for other limited purposes that did not tend to support the bad faith claim.

At the close of Brown's evidence, Liberty Mutual moved for judgment as a matter of law on Brown's breach of contract claim. In a bench ruling, the trial court granted Liberty Mutual's motion, concluding that Brown had failed to present sufficient evidence from which the jury could reasonably find that Liberty Mutual knew that Brown's doctors would not treat her unless Liberty Mutual pre-approved treatment or that it would have refused to pay for treatment if requested to do so. Brown now appeals the judgment of the trial court based on its evidentiary ruling.

### Admissibility of Dr. DuShuttle's Notation

■ The evidence offered by Brown to prove the insurer's bad faith refusal to authorize necessary medical treatment is the asserted truth of the note in Dr. DuShuttle's medical records stating: "The insurance company would not approve the stellate ganglion blocks which Dr. Islam recommended." [6] The trial court permitted Brown to introduce Dr. DuShuttle's notation under the medical diagnosis and business record exceptions to the hearsay rule,[7] but only for limited purposes and not to prove the insurer's knowledge that pre-approval was required by the treating physician and that approval was refused. Specifically, the court instructed the jury that it could consider the notation only as evidence of Dr. DuShuttle's beliefs in devising a course of treatment for Brown and as evidence of the medical record that was transmitted to Liberty Mutual.

■ On appeal, Brown argues that Dr. DuShuttle's notation was admissible for all purposes and that the court should have considered the notation as substantive evidence of bad faith refusal in deciding Liberty Mutual's motion for judgment as a matter of law. We review a trial court's

6. Liberty Mutual argues that this issue is moot because Dr. DuShuttle's testimony on cross-examination and re-direct examination was not subject to the limitations imposed by the court and was thus admissible for all purposes. As a result, Liberty argues, Brown was not prejudiced by the trial court's decision to limit the purposes for which the evidence was admitted. Liberty's argument, however, runs against the general rule that "[w]hen evidence which is admissible as to 1 party or for 1 purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." D.R.E. 105. Moreover, the case cited by Liberty, *James v. Glazer*, Del.Supr., 570 A.2d 1150, 1156 (1990), does not support the proposition that

the court's limitations on the admission of evidence do not apply to cross-examination testimony. To the contrary, the Court in *Glazer* affirmed a trial court's decision to admit cross-examination testimony for the limited purpose of impeaching a witness and not with respect to the ultimate issues in the case.

7. The trial court did not state clearly on which exception it relied and held that: "[T]he business record, or medical record referred to by the witness may be admitted but for a limited purpose ... to explain Dr. DuShuttle's belief and course of medical treatment based on that belief [and] to show the medical record that Brown contends was transmitted to Liberty Mutual."

decision to admit or to exclude evidence to determine whether the court's ruling was an abuse of discretion.[8] We hold here that the Superior Court did not abuse its discretion in excluding the evidence for the purpose offered, but our analysis differs from that of the trial court on the application of the hearsay rules.

Hearsay is a statement made by a declarant outside the courtroom that is offered to prove the truth of the contents of the statement.[9] The disputed notation in this case is an out-of-court statement attributed to the insurer by an employee in Dr. DuShuttle's office and recorded by Dr. DuShuttle in Brown's medical file. Therefore, the notation is inadmissible hearsay if it is offered to prove that Liberty Mutual actually denied pre-approval—unless the notation falls within a recognized hearsay exception.[10] Similarly, Dr. DuShuttle's testimony describing his conversations with the clerks in his billing department during the pre-approval process is inadmissible hearsay unless it is offered for a nonhearsay purpose or it falls within a hearsay exception.

Brown presents · five theories under which Dr. DuShuttle's testimony and the notation may be admissible for all purposes, either under a hearsay exception or as evidence that falls outside the definition of hearsay. Brown argues that the evidence is admissible: (1) as a record kept in the regular course of business,[11] (2) as a statement "for purposes of medical diagno-

sis or treatment,"[12] (3) as a statement with sufficient "circumstantial guarantees of trustworthiness,"[13] (4) as the "routine practice of an organization,"[14] and (5) as a nonhearsay statement indicating that Liberty Mutual had notice that pre-authorization was required for treatment. We address each argument in turn.

### A. Business Records Exception

▮ Brown's strongest argument is that Dr. DuShuttle's notation is admissible under the hearsay exception for records kept in the regular course of business. Although Dr. DuShuttle's notation in Brown's medical record satisfies some of the requirements for admission under the business record exception, the circumstances surrounding the making of the notation cast serious doubt on its reliability. We conclude that the notation is not admissible as a business record and thus should have been excluded for all purposes under D.R.E. 803(6).

An out-of-court record of an act or event is admissible under the business records exception (1) if the record was "made at or near the time" of the act or event (2) "by, or from information transmitted by, a person with knowledge," (3) if the record is prepared and maintained "in the course of a regularly conducted business activity" and (4) if it was the regular practice of the organization to make a record of the act or event.[15] Even if the statement satisfies

---

8. *See Gannett Co., Inc. v. Kanaga,* Del.Supr., 750 A.2d 1174, 1183 (2000); *see also* D.R.E. 103(a).

9. *See* D.R.E. 801(c).

10. *See* D.R.E. 802. As we discuss in more detail below, the statement actually constitutes hearsay within hearsay because Dr. DuShuttle made the notation based on a statement by his billing clerk. *See* D.R.E. 805.

11. *See* D.R.E. 803(6).

12. *See* D.R.E. 803(4).

13. *See* D.R.E. 803(24).

14. *See* D.R.E. 406.

15. D.R.E. 803(6); *McLean v. State,* Del.Supr., 482 A.2d 101, 104–05 (1984). The proponent of the business record must establish these facts through "the testimony of the custodian or other qualified witness." D.R.E. 803(6).

these requirements, however, the trial court may nevertheless exclude the statement where the method of preparation of the record or the source of the information "indicate[s] [a] lack of trustworthiness." [16]

Although neither party discusses the issue at length, Dr. DuShuttle's notation in Brown's medical records technically constitutes hearsay within hearsay under D.R.E. 805.[17] The first layer of hearsay is the billing clerk's statement that Liberty Mutual refused to authorize the nerve blocks. The second layer is Dr. DuShuttle's notation of the clerk's statement in Brown's medical record. Even if a business record includes hearsay within hearsay, however, the record may fall within the business record exception so long as the source of the information and the person who records the information are acting in the regular course of business.[18] In the present case, both Dr. DuShuttle and the billing clerk were acting in the regular course of business and both had a business duty to provide accurate information in Brown's medical records. If the notation

satisfies the other requirements for admission outlined above, the notation may therefore fall within the business record exception.

Even assuming that Dr. DuShuttle's notation in Brown's record technically satisfies the three main elements of the business records exception, however, we conclude that the notation is inadmissible because "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." [19] The business records exception to the hearsay rule permits the admission of hearsay documents that are likely to be trustworthy because a business regularly maintains and relies on them.[20] Thus, as the Second Circuit has observed: "The principal precondition to admission of documents as business records pursuant to Fed.R.Evid. 803(6) is that the records have sufficient indicia of trustworthiness to be considered reliable." [21]

In the present case, the entry in Brown's record was made under circumstances that seriously undermine the relia-

16. D.R.E. 803(6).

17. The term "hearsay within hearsay" describes a situation in which a statement or record is made by one person based on information supplied by another person. Rule 805 provides that "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules."

18. *See United States v. Turner*, 8th Cir., 189 F.3d 712, 719–20 (1999) ("If both the source and recorder of the information were acting in the regular course of the organization's business, however, the hearsay upon hearsay problem may be excused by the business records exception to the rule against hearsay [in F.R.E. 803(6)].''); 3 Federal Rules of Evidence Manual 1673 (7th ed. 1998) ("If the reporter is operating under the same or similar "business" duty (i.e., duty to report accurately) as the recorder, then the risk of inaccuracy is substantially reduced—the same

guarantees of reliability apply to the observer and the recorder.''); 3 Handbook of Fed. Evid. § 803.6 n. 25 (5th ed. 2001) ("If both the source and the recorder of the information, as well as every other participant in the chain producing the record, are acting in the regular course of business, the multiple hearsay is excused by Rule 803(6).'').

19. D.R.E. 803(6).

20. *See McLean*, 482 A.2d at 104 ("It is the habit and continuity of keeping records germane to the business activity which lends reliability to the business records.''); *see also* 3 Federal Rules of Evidence Manual, *supra*, at 1670–71 (noting that the "organization's reliance on the records is a basis for the reliability for the exception'').

21. *Saks Int'l, Inc. v. M/V Export Champion*, 2nd Cir., 817 F.2d 1011, 1013 (1987).

bility of the notation. First, Dr. DuShuttle is unsure about the precise time that elapsed between his conversation with the billing clerk and his recording of the notation in Brown's records. The question here is similar to the first element of the business records exception: Whether Dr. DuShuttle recorded the statement "at or near the time" that his billing clerk told him that Liberty Mutual had denied preauthorization. The general rule is that the record must be made within a "reasonable time" of the underlying event.[22] The definition of "reasonable time" varies from case to case, but courts generally require that the record be created within a few weeks of the event.[23] This remoteness inquiry "depends upon whether the time span between the transaction and the entry was so great as to suggest a danger of inaccuracy by lapse of memory."[24]

Dr. DuShuttle testified during *voir dire* that, around May or June of 1995, his billing clerk informed him of the alleged denial, but it was not until October 7, 1995 that he entered the note that documented this conversation. From Dr. DuShuttle's testimony, the best that can be inferred is that the notation was not made until over three months after his conversation with the unidentified billing clerk. In the circumstances of this case, the length of the interval between the conversation and the entry in Brown's records raises a serious concern that the notation may have been the product of a faulty hearing, transmission or recall of the conversation.

 Second, Dr. DuShuttle could not identify the clerk in his office who telephoned Liberty Mutual to get the preauthorization or the person who told him that Liberty Mutual denied the authorization.[25] Consequently, Liberty Mutual had

**22.** See *Seattle–First Nat'l Bank v. Randall*, 9th Cir., 532 F.2d 1291, 1296 (1976) (observing that a business record should be "made contemporaneously with the transaction or a reasonable time thereafter.").

**23.** See, e.g., *Hiram Ricker and Sons v. Students Int'l Meditation Soc.*, 1st Cir., 501 F.2d 550, 554 (1974) (finding that one week is too long); *Willco Kuwait S.A.K. v. deSavary*, 1st Cir., 843 F.2d 618, 627–28 (1988) (finding that three months is too long); *see also* 2 McCormick on Evidence § 289, at 258 & n. 3 (5th ed.1999) (observing that, in determining the reasonableness of the interval between the transaction and the making of the record, courts should consider the circumstances of each case).

**24.** 2 McCormick on Evidence, *supra*, § 289 at 258.

**25.** This analysis also relates to whether Dr. DuShuttle received the information from "a person with knowledge" under the second prong of Rule 803(6). As a general rule, business records are admissible under Rule 803(6) even if the original source of the underlying information is unknown, so long as the information is prepared and maintained in the regular course of business by employ-

ees with a business duty to report the information accurately. See *Saks*, 817 F.2d at 1013 ("[T]here is no requirement that the person whose first-hand knowledge was the basis of the entry be identified, so long as it was the business entity's regular practice to get information from such a person."); *see also Lacy v. CSX Transp. Inc.*, W.V.Supr., 205 W.Va. 630, 520 S.E.2d 418, 435 (1999) (same); *Baxter Healthcare Corp. v. Healthdyne, Inc.*, 11th Cir., 944 F.2d 1573, 1577 (1991) (same). Where one or more of the parties was *not* under a business duty to report, by contrast, the original source of the information in a business record must be identified because the opposing party must have an opportunity to test the reliability of the information. See, e.g., *Ricciardi v. Children's Hosp. Med. Ctr.*, 1st Cir., 811 F.2d 18, 22–23 (1987) (holding that note describing accident during surgery did not fall within exception because the doctor who made the note did not see the operation and could not identify the source of the information). Since Dr. DuShuttle testified that employees in the billing department are under a business duty to report the status of insurance authorizations accurately to him, the notation technically satisfies the "personal knowledge" element of the exception.

no opportunity to call as a witness or to question the person who allegedly spoke to the Liberty Mutual agent to request the pre-authorization. Third, Dr. DuShuttle testified that, although he regularly consults with his billing department and regularly records denials of pre-authorization in patient records, the billing department does not document its communications with insurance companies.

These factors indicate a high risk that either or both of the following problems may have infected the evidence offered: (1) that Dr. DuShuttle's notation was based on a faulty memory of what his billing clerk told him, or (2) that the billing clerk did not accurately hear or report the details of the alleged conversation with Liberty Mutual.[26] As a general rule, issues of faulty memory and inaccurate reporting merely affect the weight and credibility of testimony, which must, of course, be resolved by the jury.[27] But that is the case only when the evidence does not require a foundation to authorize its admission under the hearsay rules.

The lack of reliability of the notation is problematic in this case because a foundation must be established to allow the evidence to be admitted for its truth under the business records exception and to prove the elements necessary to resolve the breach of contract issue. That issue depends upon exactly what Liberty Mutual knew when and if it refused to pre-approve Brown's treatment. The precise wording of the record documenting the alleged conversation between the billing clerk and a Liberty Mutual agent therefore becomes

crucial because it purports to describe what Liberty Mutual was told and how it responded.

In view of these concerns, we find that the circumstances under which the notation was prepared "indicate lack of trustworthiness." Accordingly, we conclude that the notation was not admissible under the business records exception to the rule against hearsay, and the trial judge did not abuse his discretion in refusing to admit this evidence to prove its truth.

### B. Medical Diagnosis or Treatment Exception

██ Brown next argues that Dr. DuShuttle's notation in Brown's medical record is admissible as a statement "for purposes of medical diagnosis or treatment" under D.R.E. 803(4). This exception authorizes the admission of statements (1) "made for purposes of medical diagnosis or treatment" and (2) "describing medical history, or past or present symptoms, pain or sensations, or the inception or general character of the cause or external course" of the symptoms.[28] As noted above, under D.R.E. 805, statements that include hearsay within hearsay are admissible only if each layer of hearsay is covered by an exception.

██ Even assuming for the sake of simplicity that the first layer of hearsay (that is, the billing clerk's statement to Dr. DuShuttle) falls under the business records exception, the second layer of hearsay (the notation by Dr. DuShuttle in Brown's medical records) is not admissible as a

---

**26.** There is no suggestion that Dr. DuShuttle had a motivation to fabricate the notation, for example in anticipation of litigation. Rather, the concern is that the notation is not trustworthy because of the length of time that elapsed between Dr. DuShuttle's conversation with his billing clerk and the entry in Brown's records.

**27.** *See Pryor v. State*, Del.Supr., 453 A.2d 98, 100 (1982) ("The jury is the sole judge of a witness' credibility and is responsible for resolving conflicts in testimony.").

**28.** D.R.E. 803(4).

statement for medical treatment or diagnosis. Under the second prong of Rule 803(4),[29] the notation concerns only the alleged denial of coverage and does not describe Brown's condition, symptoms, or sensations or relate to Brown's medical history or to the cause of her symptoms. The notation, therefore, does not satisfy the requirements for admission as a statement for the purpose of medical treatment or diagnosis.

### C. Residual Exception

 Brown argues that, if the notation does not fall under either the medical diagnosis or the business records exception, it is admissible under the residual hearsay exception provided by D.R.E. 803(24). This exception covers hearsay statements that are not admissible under the other exceptions but have "equivalent circumstantial guarantees of trustworthiness."[30] To be admitted under this exception, the statement must satisfy three conditions: (1) "the statement [must be]

offered as evidence of a material fact," (2) the proponent could not find more probative evidence of that fact by reasonable efforts, and (3) admission of the statement serves the purposes of the Rules.[31] These requirements must be construed narrowly to ensure that application of the residual exception does not "dramatically revis[e] the hearsay rule."[32]

The issue here is whether Dr. DuShuttle's notation carries sufficient circumstantial guarantees of trustworthiness. For at least the same reasons that the notation is not admissible under the business records exception, it fails to meet the criteria of the residual hearsay exception. The significant lapse in time, amounting to at least three months between the billing clerk's conversation with the Liberty Mutual agent and the entry of the notation in Brown's records, seriously undermines the reliability of the notation.[33] We need not consider other problems relating to the trustworthiness of the notation because the time lapse alone is sufficient to render

---

**29.** Under the first prong of Rule 803(4), Dr. DuShuttle testified that he recorded the alleged denial of pre-authorization in Brown's records because he used this information in setting the course of her treatment. This testimony provides a sufficient indication that Dr. DuShuttle made the notation for purposes of medical treatment. Liberty argues that Dr. DuShuttle did not make the notation for purposes of treatment because the alleged denial of coverage did not actually change the course of treatment. This argument mischaracterizes the requirements of the exception. Rule 803(4) does not require that the medical record actually affect the course of treatment; rather, the exception may apply so long as the record was made "for purposes of medical diagnosis or treatment." In any event, Brown's course of treatment may have changed as a result of the alleged denial: According to Brown, if Liberty had approved payment, Brown would have received the recommended nerve block treatments.

**30.** D.R.E. 803(24).

**31.** D.R.E. 803(24). The exception also requires the proponent of the statement to notify the opposing party of the proponent's intention to introduce the statement "sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to meet it."

**32.** *United States v. Sinclair*, 7th Cir., 74 F.3d 753, 759 (1996) (citing Notes of the Committee on the Judiciary, S.Rep. No. 93–1277, Note to Paragraph (24), Fed.R.Evid. 803, 28 U.S.C.A. (West 1984)).

**33.** *See Sinclair*, 74 F.3d at 759 ("Most of the recognized exceptions to the hearsay rule permit the admission of hearsay statements that convey personal knowledge at the time of their utterance .... The immediacy of this knowledge is one of the key circumstances indicating trustworthiness. These exceptions to the hearsay rule do not include statements that express memory of distant events.") (internal citation omitted).

the residual hearsay exception inapplicable in this situation.[34]

### D. Evidence of Office Routine

 Brown next contends that Dr. Du-Shuttle's testimony about his office procedures for documenting the denial of pre-authorization is admissible as the "routine practice of an organization ... [offered] to prove that the conduct of the person or organization on a particular occasion was in conformity with the ... routine practice."[35] Brown seeks to show that Liberty Mutual was aware that pre-authorization was required for Brown's treatment by proving that Dr. DuShuttle would note a denial of pre-authorization in a patient's records only if the billing department had conclusively confirmed the denial.

 Rule 406 does not authorize the admission of every personal habit or office routine. Under this rule, only evidence of "specific, 'semi-automatic' conduct that is capable of consistent repetition" is admissible to prove conformity with that habit on a particular occasion.[36] Courts generally apply a more liberal standard to evidence of office routine than they apply to evidence of personal habit because there

is no concern that the evidence could be used improperly as character evidence.[37] Nevertheless, to be admissible under Rule 406, the office routine must be relatively simple, involve little judgment, and not be "susceptible to too much variation."[38]

Although Dr. DuShuttle's *voir dire* testimony established that the billing department followed the same general procedure in documenting denied pre-authorizations, this procedure is not a series of "semi-automatic" actions involving minimal judgment or variation. On the contrary, the office routine appears to be relatively informal and *ad hoc.* For example, Dr. DuShuttle testified that requests for pre-authorization are not always performed by the same employees in his office. Dr. DuShuttle also testified that there was no regular reporting routine; instead, he would generally just "go up to the Billing Department [and] say what's the status, what's going on." Because of the casual and discretionary nature of this process, we conclude that Dr. DuShuttle's testimony about his office's procedures is not admissible as evidence of a "routine practice" under Rule 406.[39]

---

34. Liberty also observes that Brown failed to seek out more probative evidence of Liberty's alleged denial of pre-authorization because Brown did not produce any of the employees in the billing department of Dr. DuShuttle's practice. Brown counters that "no staff member could be found who has a specific recollection of calling Liberty Mutual on Ms. Brown's behalf" because of the volume of calls that the staff makes each day. In view of the reliability problems discussed above, there is no need to reach this issue.

35. D.R.E. 406.

36. *Brett v. Berkowitz,* Del.Supr., 706 A.2d 509, 516–17 (1998).

37. *See* 1 Federal Rules of Evidence Manual, *supra,* at 558.

38. *See id.* Examples of admissible office routines are: always obtaining signed consent forms before administering vaccines, *see In re Swine Flu Immunization Products Liability Litigation,* D.Colo., 533 F.Supp. 567, 574 (1980), always sending a copy of a complete proposal to general contractors, *see Envirex, Inc. v. Ecological Recovery Assoc. Inc.,* M.D. Pa., 454 F.Supp. 1329, 1333 (1978), always informing patients of the risks of using a particular drug, *see Hall v. Arthur,* 8th Cir., 141 F.3d 844, 849 (1998), and always using the same bus to go home from work, *see Howard v. Capital Transit Co.,* D.D.C., 97 F.Supp. 578 (1951).

39. Even if Dr. DuShuttle's office procedure were a "routine practice" under Rule 406, the evidence would be admissible only to prove that the billing clerk called Liberty Mutual and that Liberty Mutual denied the pre-autho-

### E. Nonhearsay Use

■ Finally, Brown contends that Dr. DuShuttle's notation is admissible if it is offered for a nonhearsay purpose. Under this theory, Brown would not offer the statement to prove the truth of the contents of the statement (i.e., that Liberty Mutual "would not approve the stellate ganglion blocks which Dr. Islam recommended."). Instead, Brown would offer the notation for the nonhearsay purpose of proving that Liberty Mutual had notice that pre-authorization was required before Brown could receive the recommended treatment.

Although Dr. DuShuttle's notation is evidence that his office contacted Liberty Mutual about pre-approval for Brown's treatment,[40] the notation is not evidence that Liberty Mutual was notified that Brown would not receive nerve block treatments if Liberty Mutual denied pre-approval. Indeed, nothing in Dr. DuShuttle's notation or in the medical records supports a reasonable inference that the physician who was to perform the treatment required pre-authorization.[41] At most, the

notation indicates that Liberty Mutual had notice of Brown's claim for benefits and of Dr. DuShuttle's belief that Liberty Mutual had denied pre-approval for the claim.[42] We find that the notation is not competent evidence that Liberty Mutual had notice of the alleged pre-authorization requirement and is therefore not admissible for the nonhearsay purpose proposed by Brown.

### Decision to Grant Judgment as a Matter of Law

■ In ruling on Liberty Mutual's motion for judgment as a matter of law, the Superior Court found that

> [T]here is no evidence from which this jury could conclude that the defendant was put on notice, that preapproval of the nerve block procedure was necessary in order for the service to be provided .... [or] that Liberty Mutual would not have paid for such a procedure ultimately upon being submitted a bill for it.

Brown argues that the Superior Court improperly granted Liberty Mutual's motion because the court ignored probative evidence that Liberty Mutual was aware that

---

rization. The office routine could not be used as evidence that the billing clerk told Liberty Mutual that pre-authorization was required.

40. When considered together with evidence that Dr. DuShuttle's records were transmitted to Liberty Mutual, the notation is also evidence that Liberty Mutual was notified that Dr. DuShuttle believed that Liberty Mutual had denied approval for Brown's treatment.

41. *Cf. Gannett Co., Inc. v. Kanaga,* Del.Supr., 750 A.2d 1174, 1188 (2000) ("While the plaintiff is entitled to the benefit of reasonable inferences from established facts, the jury cannot supply any omission by speculation or conjecture."); *see also Mazda Motor Corp. v. Lindahl,* Del.Supr., 706 A.2d 526, 530 (1998) (holding that, in deciding a motion for summary judgment, the plaintiff is entitled to "all *reasonable* inferences that can be drawn [from the evidence]") (emphasis added).

42. *See, e.g., Worsham v. A.H. Robins Co.,* 11th Cir., 734 F.2d 676, 687 (1984) (finding that complaints about a product's design were admissible for the nonhearsay purpose of proving that the manufacturer had notice of potential defects in the design); *Oberg v. Honda Motor Co., Ltd.,* Or.Supr., 316 Or. 263, 851 P.2d 1084, 1087 (1993) (holding that Consumer Product Safety Commission documents received by the manufacturer describing the dangers of all-terrain vehicles were admissible to prove that the manufacturer "had knowledge of the potential dangerousness of ATVs"), *rev'd on other grounds,* 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994); *see also* 2 McCormick on Evidence, *supra,* § 249, at 102 ("A statement that D made a statement to X is not subject to attack as hearsay when its purpose is to establish the state of mind thereby induced in X, such as receiving notice or having knowledge....").

pre-authorization was required to begin treatments and that, without justification, Liberty Mutual refused to authorize the treatments.

This Court reviews *de novo* the Superior Court's decision to grant judgment as a matter of law.[43] To grant judgment as a matter of law on a particular issue, the Superior Court must find that "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."[44] On appeal, this Court must determine " 'whether the evidence and all reasonable inferences that can be drawn therefrom, taken in a light most favorable to the non-moving party, raise an issue of material fact.' "[45]

To survive Liberty Mutual's motion for judgment as a matter of law on her claim alleging a breach of the implied covenant of good faith and fair dealing, Brown must present sufficient evidence from which a jury may reasonably infer (1) that Liberty Mutual knew that pre-approval was required for the nerve block treatments and (2) that Liberty Mutual denied pre-authorization for the treatments (3) without reasonable justification.[46]

Excluding Dr. DuShuttle's notation and his supporting hearsay testimony, the sum of Brown's admissible evidence appears to be: (1) that Liberty Mutual was aware of the RSD diagnosis and the accompanying recommendation of nerve block treatments, (2) that Liberty Mutual was also aware of the rapid, predicted deterioration of Brown's condition in the absence of the nerve block treatments, and (3) that doctors customarily require pre-authorization before proceeding.

On the notice issue, Brown raised a genuine issue of material fact concerning the existence of a custom among doctors to require pre-approval before proceeding with a new course of treatment. Specifically, Dr. DuShuttle agreed that it is "customary in the medical profession to get pre-authorization" before conducting a procedure. In contrast, a Liberty Mutual employee testified that, with some limited exceptions, Liberty Mutual ordinarily does not pre-authorize procedures over the telephone. Resolving this dispute in a manner most favorable to Brown, a reasonable jury could infer that it is a general custom in the medical community to require such pre-authorization before treatment.

Nevertheless, Brown has presented no competent evidence to support her contention that Liberty Mutual was aware of this requirement or that the billing clerk in Dr. DuShuttle's office notified Liberty Mutual of the requirement. Indeed, Brown did not even present evidence that Dr. Godfrey always requires pre-approval before administering nerve block treatments.[47] Brown suggests that the jury could infer Liberty Mutual's knowledge of the pre-authorization requirement from the testimony of Liberty Mutual's employees that

43. *Brown v. Liberty Mut. Ins. Co.*, Del.Supr., C.A. No.97C–05–023, 1999 WL 1143325 (Aug. 20, 1999) (Mem. Op. at 20).

44. Super. Ct. Civ. R. 50(a).

45. *Trievel*, 714 A.2d at 744 (citations omitted).

46. *See Tackett v. State Farm Fire and Cas. Ins. Co.*, Del.Supr., 653 A.2d 254, 262 (1995) ("A plaintiff seeking to establish a claim of bad faith in a first-party insured-insurer contractual relationship must show that the insurer lacked reasonable justification in delaying or refusing payment of a claim.").

47. As support for this assertion, Brown can point only to her testimony that she was not "able to get treated without the preauthorization for insurance coverage." This testimony is insufficient to support an inference that Dr. Godfrey always requires pre-authorization before treating a patient.

Liberty Mutual pre-authorizes expensive procedures in some situations.

Contrary to Brown's contentions, however, we find that this testimony does not support a reasonable inference that Liberty Mutual "normally" or "routinely" requires pre-authorization or that it knew of a pre-authorization requirement among physicians. Absent evidence that Liberty Mutual knew that Brown would not receive treatment because of its alleged denial of pre-approval, Brown's claim that Liberty Mutual unreasonably refused payment must fail as a matter of law.[48]

As the Superior Court observed, there is also no evidence that Liberty Mutual would have refused to pay (or unreasonably delayed payment) for the nerve block treatments if it had been requested to do so. Of course, as Brown argues, an insurer's denial of pre-authorization may well be the functional equivalent of a refusal to pay the claim altogether if physicians are unwilling to proceed without guaranteed payment. Brown's argument thus raises the question whether an insurer may breach the implied covenant of good faith and fair dealing by denying pre-approval for necessary treatment where pre-approval is not required by the insurance contract but the insurer knows that pre-approval is required before a doctor will administer the treatment. Because we have concluded that Brown has presented no evidence that Liberty Mutual was aware that pre-approval was required, there is no need to decide this issue here.

***Conclusion***

We find that the notation in Brown's medical records indicating that Liberty Mutual had denied pre-authorization was not admissible, either as nonhearsay or under a recognized hearsay exception. Therefore, we conclude that Brown has not presented sufficient evidence from which the jury could find in her favor on the bad faith claim. Accordingly, we affirm the judgment of the Superior Court.

**48.** Brown contends that Dr. Sowa's December 11, 1995 report provides evidence that Liberty Mutual denied pre-authorization for the nerve blocks. Dr. Sowa's report states that "apparently the [nerve block treatment] was not approved" by Brown's insurer. Although this statement is undoubtedly based upon the notation in Dr. DuShuttle's records, Liberty Mutual evidently failed to object to the introduction of this report. Since Dr. Sowa noted only that Liberty Mutual denied pre-authorization, however, his report does not provide evidence that Liberty Mutual was aware that pre-authorization was required or that Liberty Mutual unreasonably denied pre-authorization.